E-FILED
Wednesday, 14 May, 2025  03:09:27 PM
Clerk, U.S. District Court, ILCD

# EXHIBIT A

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION

|  |  |  |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, *ex rel.* LISA MADIGAN, Attorney General of the State of Illinois, | ) ) ) ) | |
| Plaintiff, | ) ) | No. 2018 CH 04549 |
| v. | ) ) ) | Hon. Neil H. Cohen |
| MAJOR ENERGY ELECTRIC SERVICES LLC, a New York Limited Liability Company, | ) ) ) ) | **FILED** CH- MAY 14 2018 |
| Defendants. | ) ) ) | DOROTHY BROWN CLERK OF THE CIRCUIT COURT OF COOK COUNTY, IL |

## COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

Plaintiff, THE PEOPLE OF THE STATE OF ILLINOIS, by and through LISA

MADIGAN, Attorney General of the State of Illinois, brings this action against defendant,

MAJOR ENERGY ELECTRIC SERVICES LLC ("Major"), for violations of the Illinois

Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 *et seq.*, the Illinois

Telephone Solicitations Act, 815 ILCS 413/1 *et seq.*, the Illinois Automatic Contract Renewal

Act, 815 ILCS 605/5, *et seq.*, and the Illinois Prizes and Gifts Act, 815 ILCS 525/1 *et seq.*

## INTRODUCTION AND BACKGROUND

1.      Major has engaged in a pattern and practice of deceptive conduct intended to defraud

Illinois consumers through door-to-door and telephone solicitations, in-person solicitations at

retail establishments, advertisements on its website, and direct mail advertisements. The

Attorney General brings this action to remedy Major's unlawful conduct in its marketing of retail

electricity supply to Illinois consumers and seeks to recover millions of dollars Illinois

consumers have lost to Major's fraudulent marketing activities, require Major to pay civil

penalties authorized under the Consumer Fraud Act, and revoke Major's authority to operate in

the State.

2.      Unlike public utility companies, Major is a private business that purchases electricity on

the open market. Major then resells the electricity supply to Illinois consumers using unlawful

marketing tactics designed to convince consumers to switch from their current electricity

supplier, typically Commonwealth Edison Company ("ComEd").  Almost 98% of the time Major

billed customers at a rate higher than the ComEd rate.

3.      Major's marketing vendors, which, according to Major's Compliance Manual, are "an

extension of Major," achieve their sales goals through deception and confusion. Major's

representatives systematically enroll customers without first offering a fair presentation of

Major's products and services and before the customer even has the opportunity to consent to the

solicitation. Major's representatives conceal that Major is a private company selling electric

supply for profit and instead give consumers the impression their exchange with Major is a

necessary, rudimentary step performed, or sanctioned, by the public utility to reduce the costs on

the consumer's electricity bill. These promised savings are almost never realized.

4.      Major's fraud is systematic and intentional. For example, Major has maintained a long-

standing relationship – from at least 2012 to the present – with a vendor who described ████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████ Major knew of this illegal conduct and chose to allow it to continue. Upon

information and belief, Major still uses this vendor today.

5.      In sum, Major's sales representatives use aggressive tactics to hook consumers with the knowingly false promise of savings and then bypass any explanation of the actual products or services the customer is buying. Consumers are left confused, irritated, and, in almost all cases, paying higher electricity rates.

6.      As a result of Major's unlawful marketing scheme, Illinois consumers who were signed up for Major's services since 2012 have paid over $2.4 million more on their electricity bills than they would have paid if ComEd had been their electricity supplier.

## PARTIES

7.      Plaintiff, the People of the State of Illinois, by Lisa Madigan, the Attorney General of the State of Illinois, is authorized to enforce the Consumer Fraud Act, the Telephone Solicitations Act, the Automatic Contract Renewal Act, and the Prizes and Gifts Act.

8.      Defendant, Major, a New York limited liability company with its principal place of business at 100 Dutch Hill Road, #310, Orangeburg, New York 10962, is an alternative retail electricity supplier ("ARES") certified by the Illinois Commerce Commission ("ICC") to engage in the sale of electricity to residential retail customers in the service area of the public electric utility, ComEd. At all relevant times, Major was engaged in trade and commerce in Illinois by marketing, selling, and promoting electricity supply to Illinois residents.

9.      For purposes of this Complaint for Injunctive and Other Relief, any references to the acts and practices of Major shall mean such acts and practices are by and through the acts of Major's officers, owners, members, directors, employees, representatives and/or other agents.


## PUBLIC INTEREST

3

10.     The Illinois Attorney General believes this action to be in the public interest of the citizens of the State of Illinois and brings this lawsuit pursuant to the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/7(a), the Illinois Telephone Solicitations Act, 815 ILCS 413/25(e), the Automatic Contract Renewal Act, 815 ILCS 601/15, and the Prizes and Gifts Act, 815 ILCS 525/40(c).

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over this action pursuant to the Court's general jurisdiction and pursuant to 815 ILCS §505/1 *et seq*, 815 ILCS 413/10 *et seq.*, 815 ILCS 605/5, *et seq.*, 815 ILCS 525/1 *et seq.*, and 735 ILCS § 5/2-209(a) as the cause of action arises from actions taken by Major in Illinois.

12.     This Court has personal jurisdiction over Major because it transacts business in Illinois, including in Cook County, Illinois.

13.     Venue for this action is proper in Cook County, Illinois, pursuant to Section 2-101 and Section 2-101(a) of the Illinois Code of Civil Procedure, 735 ILCS 5/2-101, 101(a), because Major is doing business in Cook County, Illinois, and some of the transactions out of which this action arose occurred in Cook County, Illinois.

## TRADE AND COMMERCE

14.     Subsection 1(f) of the Consumer Fraud Act, 815 ILCS 505/1(f), defines "trade" and "commerce" as:

> The terms 'trade' and 'commerce' mean the advertising, offering for sale, sale, or distribution of any services and any property, tangible or intangible, real, personal, or mixed, and any other article, commodity, or thing of value wherever situated, and shall include any trade or commerce directly or indirectly affecting the people of this State.

4

15. At all times relevant to this complaint, Major was engaged in trade and commerce in the State of Illinois by marketing, selling, and promoting electricity supply to Illinois residents.

## MAJOR'S COURSE OF CONDUCT

16. In April 2012, Major received a Certificate of Service Authority from the ICC to operate as an ARES in Illinois. Under the certificate, Major may sell electricity to eligible residential and nonresidential retail customers in ComEd's service area, and has a continuing, statutory obligation to comply with all enumerated requirements for certification and "all other applicable laws and regulations," pursuant to 220 ILCS 5/16-115(d)(8) and 220 ILCS 5/16-115A(a)(ii).

17. Since 2012, Major has engaged in the marketing and sale of electricity to Illinois residential customers in ComEd's service territory.

18. During that time, Major acquired approximately ▆▆▆ new customers in Illinois.

19. As of February 2018, Major had approximately ▆▆▆ active customers in Illinois.

### Retail Electricity Supply

20. Each public electric utility in Illinois has a defined service territory and serves all retail (*i.e.* residential and small business) customers in that territory. Traditionally, electric utilities have provided both electricity supply and the distribution service that delivers the electricity to consumers.

21. The ICC regulates the prices public electric utilities are permitted to charge eligible residential customers for electricity supply ("utility default price"). The default price reflects the utility's cost for purchasing the electricity, without any mark-up for profit.

22. Public electric utilities, like ComEd, are the default suppliers of electricity to consumers. However, under the Illinois Electric Service Customer Choice and Rate Relief Law of 1997, 220 ILCS 5/16-101 *et seq.*, consumers may choose to purchase their electricity supply from an ARES

rather than their public utility. If a consumer decides to switch to an ARES, the consumer continues to pay the utility for delivery service but pays the ARES to acquire the electricity to be delivered to the consumer. Regardless of which entity the consumer selects as their supplier, the utility continues to deliver electricity to the consumer's home.

23.    Even if a consumer chooses an ARES for electricity supply, the utility continues to bill and collect from the customer the total of the supply charge (as set by the ARES) plus the delivery charge (the rate approved by the ICC) and other incidental fees and taxes. The ARES does not send a separate bill to the consumer.

24.    Although they must be licensed by the ICC in order to sell electricity supply in Illinois, unlike public utilities, ARES' rates are not regulated by the ICC, and ARES are permitted to profit from the sale of supply in the competitive market.

25.    The ICC has reported that in 2016, ARES customers in the ComEd service area paid $152.1 million more for electricity supply in the aggregate compared to customers who remained with ComEd.

### Major's Sales Practices

26.    Major charges its customers based on how much electricity (measured in kilowatt hours) the customer uses each month. Major offers different rates (price per kilowatt hour), rate types (fixed rates and variable rates), and lengths of contract.

27.    Under Major's fixed rate products, consumers pay an introductory rate for a set period of time (often 3-months, 6-months, 12-months, or 24-months). Near the end of the initial contract term, Major sends a letter to the customer offering to enter the customer into a new fixed rate. If the customer does not respond to the notice and enter into a new fixed rate with Major by the time the initial fixed rate contract expires, Major automatically renews the customer's account

without any affirmative act by the customer, on a month-to-month basis at a variable rate until the customer contacts Major to enroll in a new fixed rate contract or to cancel service.

28.    Under Major's variable rate products, each Major customer is charged a different rate each month. The variable rate can dramatically increase at any time without prior notice to the customer and is usually higher than the utility price. The only time this rate is regularly disclosed to customers is at the end of the month when they receive their monthly bill, after they have already used and been billed for their electricity supply at that rate.

29.    Regardless of the rate plan, the rates charged to customers for Major's products in Illinois from December 2012 through January 2018 were higher than the utility default charges approximately 92% of the time.

30.    On top of the monthly per kilowatt hour charges, Major also charged some customers a monthly service fee. Between June 2016 and January 2018 alone, Major has charged almost $28,000 in monthly service fees to Illinois customers on both fixed and variable rates.

31.    Public utilities, such as ComEd, do not charge monthly service fees for supply.

32.    Major conducts marketing activities in Illinois in the form of door-to-door solicitations, in-person solicitations at retail establishments, and telephone solicitations (also referred to herein as "telemarketing"). Major advertises its product on its website and also has engaged in some direct mail marketing.

33.    Since 2012, Major has employed both internal employees and external third-party vendors (collectively referred to as "sales representatives") to market the sale of electricity supply to Illinois consumers via door-to-door solicitations, in-person solicitations at retail establishments, and telemarketing.

34.     Major drafts and provides scripts to its sales representatives. The scripts instruct the sales representatives on how to interact with customers by telephone and in person and how to market Major's products and services. Major must approve changes to scripts proposed by sales representatives, and Major prohibits sales representatives from using any scripts that it does not approve.

35.     When enrolling a new customer either by telephone or in person, Major uses a two-step process. First, a sales representative attempts to convince the consumer to enroll with Major. Second, if a consumer is interested in enrollment, Major confirms the enrollment using a statutorily-required third party verification system or letter of agency.

36.     Illinois law prohibits sales representatives from performing the enrollment verification and the verifier must be independent from both the electric supplier and its marketing agent.

37.     Major is responsible for selecting and contracting with third-parties to perform verifications. In its marketing agreements with vendors, Major prohibits its marketing vendors from choosing a third-party to perform verifications.

38.     The purpose of a third-party verification is to ensure that the consumer fully understands the terms and conditions of the service being offered, has the legal authority to effect a change on the account, and authorizes the change in electric suppliers. However, Major's third-party verifiers quickly roll through the verification process, frequently without allowing the consumer to fully answer or confirm an understanding of the questions presented—all in an effort to subscribe the consumer to Major, and all in violation of Major's statutory obligations under Illinois law.

39.     In order to keep the sales solicitation separate from the enrollment verification, Illinois law requires that during the third-party verification of the customer's enrollment, sales

8

representatives must drop off the call once the consumer is connected with the verification system. However, in violation of Illinois law, Major's sales representatives routinely remain on the telephone line during the third-party verification process and direct the consumer on how to answer certain questions.

40.     Once a sale is completed and the enrollment is verified, the vendor sends the consumer's information to Major to complete the enrollment.

41.     Major contracts with third-party marketing vendors on a commission basis. In other words, third-party marketing vendors are paid commissions based on the number of new customers they enroll.

42.     A number of provisions in these contracts create powerful incentives for marketing vendors to enroll customers. For example, in Major's marketing contract with Direct Sales Solutions, Major pays Direct Sales ████████████████████████████████████████ ████████████████████████████████████████████████ Major pays another vendor, 18 K Enterprises, ████████████████████████ ████████████████████████████████████████████████

43.     Further, Major's vendors receive additional lump sum payments for reaching enrollment targets, or ██████████████ For example, if Direct Sales Solutions enrolled █████████ █████████████████████████████████████, Direct Sales Solutions would receive from Major █████████████████████████████████████████ ████████████████████████████████████████████ ████████████.

44.    Major also pays its vendors additional payments, sometimes referred to as ███████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████

## Omissions and Misrepresentations by Major's Sales Representatives

45.    Major's sales representatives routinely make omissions or misrepresentations with the intent that consumers rely on those omissions or misrepresentations.

*Major claims that customers will save on their electricity bills, while consumers almost always end up paying more than the ComEd rate.*

46.    Major directs its sales representatives through marketing scripts to tell consumers that they will save money on their electricity bill if they enroll with Major. For the vast majority of consumers, this representation is false.

47.    Major makes savings claims and omits information about the cost of its service in order to convince consumers to switch suppliers. Consumers rely on Major's savings claims when they choose Major as their electric supplier. Because Major offers the exact same electricity supply service as the public utility, the promise of savings on electricity costs is the key reason why consumers enroll with Major.

48.    For example, a script Major provided to door-to-door sales representatives in 2014 directs them to tell consumers that they are visiting their home to "see if you are getting the maximum savings on your energy bill/s" and "see if the household is eligible for a possible reduction in costs."

49.    This script also directs Major's sales representatives to tell customers the variable rate has "savings of up to 10% BASED ON HISTORICAL savings" (emphasis in original).

50. In multiple recorded telephone solicitations, Major's sales representatives portray Major's rates as a discount on the service consumers are currently receiving from their utility, when, in fact, consumers would enter into a new contract with a new electricity supplier at a new higher rate. Major's sales representatives routinely tell customers that they are calling to "apply savings," or that consumers are entitled to a "rate reduction." They also represent to consumers that "You qualify for 20% savings."

51. Major's sales representatives, without knowing what current rate customers are paying or even who their current electricity supplier is, tell customers they are currently paying a high rate. For example, a sales script used for door-to-door solicitations in 2014 states: "Energy Supply Companies typically have lower overhead costs THAN the BIG Utility which means savings to consumers AND we also use various strategic purchasing methods to try and bring down costs as well and save our customers $" (emphasis in original).

52. In its training materials, Major tells its sales representatives: "Generation supply costs make up most of an average electric bill, so savings may be significant."

53. On one telemarketing call, in June 2013, after a consumer expressed skepticism about the purpose of the call, the sales representative repeated, "You wouldn't want to cancel a lower rate, would you? You wouldn't be unhappy with a lower rate, would you?"

54. Further, in multiple recorded calls, Major sales representatives misrepresented to consumers that the default ComEd rate was higher than it actually was at the time. For example, during several sales calls in June 2013, sales representatives told the consumers that their current rate was 8.25 cents per kilowatt hour, but the representatives had no way of knowing the particular consumer's rate. At the time, the default ComEd rate was only 5.511 cents per kilowatt hour. Major's offered rate of 6.57 or 6.69 cents per kilowatt hour was *higher* than the actual

11

ComEd rate, but Major's representatives falsely told consumers that Major's rate was *lower* than the actual ComEd rate.

55.    Major's sales representatives, both over the phone and in person, do not have access to a consumer's current supply rate unless the consumer provides that information to the sales representative. During one call in November 2015, Major offered a rate of 6.42 cents per kilowatt hour and the consumer inquired about his current rate. The sales representative simply responded: "It's higher," suggesting that the consumer's current rate was "higher" than Major's offered rate. This response was baseless because the representative had no way of knowing the consumer's current rate, and certainly could not know whether it was higher or lower than Major's offered rate. Further, the sales representative failed to provide any additional details about Major's rate structure.

56.    Later in the same call, the consumer asked again about his current rate. The sales representative, apparently attempting to give the impression that he was searching through information, responded: "There's a lot of data here. Give me time, okay?" Finally, the sales representative claimed that the consumer's rate for the past year was 8.45 cents. Again, the sales representative had no basis to assert that was the consumer's rate and had no way of knowing if the consumer used ComEd or another ARES for electricity supply. ComEd's rate information is publicly available, but the 8.45 cents rate quoted by the representative did not match the ComEd rate at the time. On the contrary, the ComEd rate in November 2015 was 7.006 cents, and never exceeded 7.572 cents during the 12 months prior to the call.

57.    In another instance, Major misrepresented the default ComEd rate in a written advertisement. The advertisement made an offer, valid through November 30, 2015, that allowed a consumer to lock in a rate of 6.99 cents per kilowatt hour for 12 months. Major's advertisement

claimed the ComEd price through May 2016 was 7.006 cents, suggesting that Major was offering a rate lower than ComEd's. In fact, the ComEd rate was 6.987 cents from January 2016 to May 2016. Further, a consumer who enrolled on the last date of the offer, November 30, 2015, would be locked into the rate of 6.99 cents from November 30, 2015 through October 31, 2016, during a time when the ComEd rate dropped even lower to 6.19 cents per kilowatt hour from June 2016 through August 2016, 6.2 cents per kilowatt hour in September 2016, and 6.388 cents per kilowatt hour in October 2016. Therefore, Major's offer was a price increase, rather than a savings.

58.    Additionally, Major currently guarantees low rates on its website by claiming: "Get a low fixed rate on your utility bills. All year. Guaranteed."

59.    Even after a consumer has enrolled with Major, Major continues to misrepresent savings claims, stating in a welcome letter: "You have now joined the hundreds of thousands of others who have chosen [Major] to be your Energy Service Company and in saving up to 10% annually. In this past year alone, our customers have already seen average savings of 8-13%."

60.    Major intends for consumers to rely on these claims about savings and low prices, yet Major's rates are almost always higher than the rate the customer would be charged if they stayed with their public utility, ComEd.

61.    Since 2012, Major customers in the aggregate were charged over $2.4 million more for electricity supply than they would have been charged had they continued to purchase supply under the default utility rate charged by ComEd.

62.    On top of paying higher monthly rates, Major customers have paid an additional $27,609.40 in monthly service fees that they would not have paid if they had remained a supply customer of their utility, ComEd.

13

*Major misleads consumers to believe that Major is affiliated with a State program.*

63.     Major's sales representatives intentionally mislead consumers by claiming the customer is eligible for savings on their electricity bills through a program sanctioned by the State of Illinois, when in fact no such program exists.

64.     Major's door-to-door solicitation training course falsely characterizes the deregulated utilities market. Major's training course tells its sales representatives: "Federal laws mandate that all states deregulate their gas and electric services by the end of 2014. It is up to each state when and how they make that transition." No such federal mandate exists. In fact, a majority of states do not have a deregulated market, and therefore, do not allow deregulated suppliers – like Major – to sell electric supply to consumers.

65.     Major directs its sales representatives through scripts to explain to consumers that the solicitation is "all part of State Deregulation."

66.     For example, in one recorded call a Major sales representative told a customer: "I'm calling on behalf of Illinois State authorized Major Energy…and you are entitled to an immediate rate reduction on the cost of your electricity." Nothing in Illinois law entitles consumers to reductions on their electricity bills.

67.     On another call, the sales representative told the consumer: "This is a State program. It's called the Energy Choice Program in the State of Illinois." No program called the "Energy Choice Program" exists in Illinois.

68.     Although an Illinois deregulation law does exist, the Illinois Electric Service Customer Choice and Rate Relief Law of 1997, 220 ILCS 16-103, does not guarantee savings to consumers. In fact, the deregulation law precludes the ICC from regulating the prices charged by alternative retail electric suppliers like Major. Further, it is not a state-sanctioned "program," but

rather a statute that allows consumers to voluntarily decide whether to stay with their public utility or select a retail electric supplier to provide their electricity supply.

*Major obtains customers' utility account numbers under false pretenses.*

69.     Major cannot enroll a consumer without first obtaining that consumer's utility account number.  As a matter of practice, Major asks for the consumer's utility account number before disclosing to the consumer the full terms and conditions of its offer and before the consumer fully consents to switching electricity suppliers.

70.     Once Major sales representatives have acquired the customer's utility account number, they transfer the customer to the third-party verification system which will "confirm" their enrollment with Major.

71.     On multiple recorded telephone solicitations, Major's sales representatives explained to the consumer they are asking for the consumer's utility account number so that they can verify the account information and "apply the rate reduction," while concealing that Major will use the consumer's utility account number to enroll them in a new contract with Major.

72.     A Major sales script used in 2014 directs the sales representative to state that the purpose of the door-to-door solicitation is a "routine follow up on the info that was sent," and sales representatives frequently tell consumers that they are calling about information that was sent in their last utility bill. However, consumers routinely respond that they have not received the referenced information. ComEd is responsible for sending utility bills to consumers, and on information and belief, ComEd has never included sales information about Major when sending out utility bills to consumers.

15

73.     Telemarketing and door-to-door sales representatives frequently instruct consumers to "grab" a copy of their ComEd bill so that the representative can "apply the rate reduction." After the consumer reads the public utility account number to the sales representative, sales representatives routinely tell the consumer they will be transferred to a complete a "quick" verification. On multiple calls, representatives instructed the consumer that during the verification process: "A clear yes allows me to move forward and apply the rate reduction. Understand that anything other than a clear yes will prevent your rate reduction from going through."

74.     On one telemarketing call the sales representative told the consumer: "All it is, your bill will not go higher, you will be at a fixed rate. You will save $20. All you have to do is verification for quality control."

75.     By using this language, sales representatives portray the enrollment process as a clerical step towards obtaining a discount, when in fact customers are unknowingly giving their authorization to enter into a new contract with a private business.

76.     Recordings of telephone solicitations reveal that, consumers often do not understand that they handed over their account number and completed a verification process in order to purchase electricity supply, often at a premium price, from Major. On the contrary, they believe they are confirming their account information in order to receive a rate reduction.

77.     Major also limits consumers' abilities to confirm the rates that are being offered outside the high-pressure setting of a telephone solicitation or door-to-door encounter. Major's current website does not advertise the rates it offers and a consumer cannot find Major's rate offers online without first submitting his or her zip code, email address, and electric provider.

16

78.    Next, the website displays a box marked "Account number (see image for help).*" The referenced image is a sample ComEd bill with a big red arrow that shows consumers where the 10-digit account number is located on the ComEd bill. The account number box is marked with an asterisk and the website states that "[a]ll fields marked with an asterisk are required." After that information is entered a new field pops up with a rate quote. Therefore, a consumer cannot obtain a rate quote without first entering his or her current ComEd account number.

79.    A customer's account number does not provide Major with information about the current rate a customer is paying for electricity supply that could enable Major to modify its rate to be competitive. Instead, a customer's account number can be used to surreptitiously transfer a customer from one supplier to another.

80.    Even when customers who visit Major's website do not enter into a contract with Major for its services, Major retains the account numbers of consumers who have provided their account numbers for the purported purpose of receiving a rate quote.

81.    The collection of customers' information when a customer has not consented to proceed with enrollment increases the chances that Major can use the customer's information to enroll a customer without proper authorization.

*Major misrepresents its association with the consumer's public utility.*

82.    During sales solicitations on the phone and in person, Major intentionally misleads consumers to believe that Major is associated or affiliated with the public utility in order to falsely assure consumers their electric utility service will not change.

83.    Major's telemarketing representatives routinely ask to speak with the person who handles the ComEd bill or say they are calling regarding the customer's ComEd bill or account. Because

of this language, consumers routinely believe that Major sales representatives are calling on behalf of the consumer's public utility – ComEd – rather than a private supplier.

84.    On one recorded call, in June 2013, in response to a consumer's question about which company was calling, the sales representative stated "Major Energy, we are the supplier to ComEd." On the same call the consumer later asked whether the sales representative was changing his electric company, and the sales representative responded, "No we're not changing electric companies. You will remain with ComEd. ComEd has different suppliers and this is a super low rate in your area."

85.    A brochure distributed to consumers contains a question and answer section. To the question "Am I leaving my utility company?" the brochure exclaims, "Not at all!" In fact, the consumer's relationship with the public utility *does* change once he or she enters into a contract with Major. Once a consumer has finalized enrollment, Major notifies the utility that the consumer has chosen to no longer take electricity supply from the utility. Although the consumer will remain a customer of the utility for delivery service, going forward, Major will provide the supply portion of the consumer's bill.

*Major conceals the terms and conditions of its variable rates.*

86.    While Major's sales scripts, sales representatives, advertising materials, and training materials boast price stability and low rates through fixed-rate contracts, from December 2012 through January 2018, Major charged a majority of its customers a variable rate.

87.    Major routinely fails to disclose how these variable rates are calculated, how the consumer's bill can substantially increase at any given time, and how the consumer receives no

added benefit at a dramatically higher price than if the consumer were to stay with the public utility.

88.     Even customers who enroll in a fixed rate are not safe from these price spikes. When Major's customers are initially placed into a fixed-rate contract, Major's sales representatives fail to disclose, and have concealed, that Major will automatically switch them into a month-to-month variable rate with Major after their initial contract terms expire.

89.     One sales script that Major has used since July 2016 states that the fixed rate "won't fluctuate" and is "guaranteed not to increase," but fails to explain that the rate can increase when the consumer is automatically placed into a variable rate contract after the term of the fixed rate contract.

90.     The sales script eventually requires the agent to disclose that "the agreement automatically renews on a month-to-month variable rate." However, it fails to explain what the variable rate means, how it is calculated, and how a consumer can avoid being placed in a month-to-month contract. It merely states that Major will provide the consumer with written notice of the "options" between 30 to 60 days after the initial term expires, which could be as long as 23 months after the consumer initially enrolled with Major.

91.     Further, although Major's written "Door to Door Sales Agreement" discloses that the contract renews on a month-to-month variable plan after the initial term and that Major will provide the consumer with "options" within 30 to 60 days prior to expiration, the written agreement does not explain what those options are. Most importantly, the written agreement does not disclose the consumer can cancel the automatic renewal or the cancellation procedure.

92.     The notice of "options" referenced in the scripts and sales agreements is inadequate. The letter informs the consumer that their current contract is "nearly over" and offers to enroll the

customer in a new fixed rate. The customer is instructed to call a "Price Protection Specialist" to enroll in the new plan. However, the notice fails to notify customers that they will be automatically enrolled in a variable rate plan that changes price every month if they do not sign up for the new fixed rate and fails to explain how a consumer can cancel the service.

93.     Not only do sales agents fail to disclose the automatic contract renewal, but they routinely give misleading responses to questions from consumers about what occurs after the fixed term expires.

94.     For example, a sales representative told a consumer in May 2013: "After this year, if you want to change in the future, you can do so." This particular call lasted over 30 minutes and the agent never disclosed that, unless the customer requested to be placed on a fixed rate plan, the customer's contract would automatically renew on a month-to-month variable rate.

95.     On another sales call in May 2013, a consumer asked what happens after the contract expires and the sales representative responded: "Either you re-enroll if you still want to continue to save or you have options to go if you want to go up to a higher rate."

96.     On information and belief, Major intended that consumers would rely on these misrepresentations and the concealment of the information when switching their electricity supply service.

*Major fails to disclose Monthly Service Fees.*

97.     Beginning in June 2016, Major began charging some customers a "Monthly Service Fee". Major has not set a standard monthly service fee rate, and charges different customers different monthly service fees. The total fee amount Major has collected from all consumers taken together in a given month ranges from $0.15 to $1,313.14. From June 2016 through January 2018, Major charged at least a total of $27,609.40 in monthly service fees.

98.    Major routinely misrepresents the existence of a service fee for consumers.  Major's sales scripts represent that Major does not charge a fee to enroll and Major's written advertisements also represent that Major does not charge fees. One brochure states that there are "No switching, maintenance or cancellation fees." Another brochure asks "Are there extra charges using Major Energy?", and exclaims in response, "NO! There are no charges for switching to Major and there are no maintenance fees."

99.    Further, the fee routinely is not disclosed in recorded calls and is not mentioned in the documents presented to a consumer to finalize the enrollment.

*Major uses "win-back" calls to scare consumers about their competitors engaging in "illegal switching" while Major's own sales representatives engage in unlawful and deceptive practices.*

100.    Major's current telemarketing activities are limited to "win-backs," which means that its agents call consumers who were previously enrolled with Major, but are no longer Major's customers.

101.    Generally, a customer can communicate the intent to cancel his or her relationship with a supplier in several different ways: (i) the customer can directly notify the electricity supplier that he or she wants to cancel its services; (ii) the customer can notify the utility he or she wants to cancel the supplier's services; or (iii) the customer can enroll with a new supplier, which will cancel the old supplier's service. In some instances, under the third scenario, consumers can become confused because they are often unaware that they switched suppliers in the first place.

102.    Major's "Winback Script", in use since January 2016, instructs sales representatives to deceive Major's former customers into re-enrolling with Major.

103.    The calls attempting to "win-back" Major's former customers mislead consumers about the purpose of Major's call. The call begins with the sales representative asking the consumer if

21

they are aware that their account has been cancelled. Routinely, consumers are confused about who is calling and are confused by the question about the cancellation because the individual customer did not submit a cancellation service, but rather, were switched by another supplier. Sometimes, consumers do not even realize they had been enrolled with Major.

104.    If the consumer states they did not send a notice of cancellation, the script instructs the sales representative to tell the consumer "you've been ILLEGALLY SWITCH [sic] from a different supplier. So, next time, if someones [sic] calls you or knocks on your door don't give out any information especially your account number to avoid illegal switching."

105.    Major's sales representatives warn the customers that sales representatives from other entities will call or knock on their door and ask for information about their utility bills and try to get their utility account number. Major cautions customers about this "illegal switching" process, but, ironically, this describes the exact process Major uses to enroll customers.

106.    Without even confirming whether the consumer understands the re-enrollment process, the sales representative then reassures the consumer that Major will handle the re-enrollment, or as the script states: "Now you don't have to worry because we can easily re-instate your account and provide you a Price Protection Plan."

107.    The sales representative does not disclose the terms and conditions of the new contract and does not even bother to ask and confirm whether the consumer wants to be re-enrolled.

108.    Since these consumers were previously customers of Major, the sales representative already has the consumer's utility account number and address – the key information a supplier needs to enroll a customer. On one recorded call in March 2016, the sales representative instructed a consumer: "In order for me to reinstate your account into a price protection plan, I have all your information, so there's no need for me to ask for your information."

109.    On another call in April 2016, the sales representative reassured the consumer: "Don't worry. This is for free. It will not change anything. I just need to reinstate your account to your old supplier."

110.    Even if the consumer confirms that he or she did indeed submit a cancellation notice, the sales representative pitches to the consumer that the next step is an easy reinstatement process, when in fact, the consumer is entering into a new contractual relationship with Major without proper disclosure of the new contract's terms and conditions.

*Major offers prizes to market electricity supply and obtains consumers' contact information but fails to clearly and conspicuously disclose the terms and conditions of the offers.*

111.    In its monthly newsletter, which is available on its website, Major offers a monthly sweepstakes wherein the winner receives a $100 gift card. Any person can enter the sweepstakes by submitting his or her name, address, phone number, and email via email to newsletter@majorenergy.com. Major uses this sweepstakes to collect consumers' contact information.

112.    The terms and conditions of the offer are not located on the same webpage as the sweepstakes offer.

113.    The terms and conditions are included in the "Official 'Newsletter Sweepstakes' Rules," which are located on a different webpage. The Sweepstakes webpage includes a link to the "Terms and Conditions," which brings consumers to another page that contains all of Major's Terms and Conditions, not only those that specifically relate to the Sweepstakes offer.

114.    To find the terms and conditions particular to the Sweepstakes, a consumer must scan the page and locate the "Newsletter Sweeps" link, which links to another page that contains the "Official 'Newsletter Sweepstakes' Rules." As such, a consumer must click on multiple

23

webpages to locate the terms and conditions of the sweepstakes. The rules are difficult to locate and a consumer likely would not find these rules unless the consumer was making an effort to look for them.

### Representative Examples of Illinois Consumer Experiences with Major

115.    Mr. B. complained to the ICC in January 2016, that "I had someone purporting to be from Major Energy knock on my door on Friday night. I believe he misrepresented his role, as he stated that he was following up on correspondence we should have received, and that he was there to check our electricity bill and ensure that ComEd wasn't overcharging us. I briefly let him see my bill, but as I started asking him more questions, his story began to fall apart and I told him I wasn't interested. I have since been online and seen that this is a scam, and that these are sales people who can sign me up to Major Energy simply by having my ComEd account number. We are immigrants to this country, and thus not overly familiar with the way things work, and who the regulatory bodies are (and it's hard to check these things when someone arrives at your door."

116.    Ms. W. complained to the Better Business Bureau in September 2016 that a door-to-door salesperson from Major offered her a "rate of 0.09 cents per kWH," which the salesperson told her "was cheaper" than her current supplier's rate. After enrolling with Major, Ms. W. noticed that her first bill was abnormally high. "When I contacted my previous supplier and current electricity provider ComEd," she wrote, "they reported their rate is 0.06 cents per kWH....As a consumer I would have not switched energy providers to pay a higher rate." In response to Ms. W.'s allegation that one of its sales representatives intentionally misquoted the default ComEd price in order to enroll her, a customer service representative from Major placed the blame

24

squarely on the consumer: "[I]t is the customers [sic] responsibility to compare the proposed price to their current supplier's rate to determine if it is in their best interest to enroll in our services at the current offer rate. Thank you and have a wonderful day." Ms. W. followed up. She explained that Major's representative "presented me with the comparable rates" and that these rates were "false information." Several weeks later, a customer service representative responded: "Thank you for your response, however, it is generally understood that it is a person's responsibility to compare prices of things they purchase. Thank you."

117.   On one recorded call in May 2013, the Major sales representative spent about 20 minutes trying to convince the account holder, Ms. J., to switch. After Ms. J. failed to complete a third-party verification, her daughter got on the line and expressed her skepticism about Major's claims of savings. The sales representative responded by reiterating the savings claims and reassuring Ms. J.'s daughter: "There are no games in this. This is a State program. It's called the Energy Choice Program in the State of Illinois."

118.   On another recorded call in June 2016, a Major sales representative tells Mr. M., a senior citizen, that she is calling "in reference to the notification that came in your last electric bill about your rate reduction." The sales representative continues: "You have been entitled to this rate reduction for quite some time now, and today it's my job to apply this for you." Without knowing whether Mr. M. is currently receiving his electricity supplier from ComEd or another ARES, and therefore unable to know what rate Mr. M. is paying, the sales representative nonetheless tells Mr. M. that he is "currently paying .0825 cents per kilowatt." "Now today, by allowing ComEd to access Major Energy's resources," the sales representative rushes ahead, "you do receive an immediate rate reduction, and that goes down to .0657" cents per kilowatt.

Apparently believing that the sales representative is simply applying a rate reduction, Mr. M. asks: "Why would I possibly say no, based on what you're saying?"

119.    Mr. M. asked the sales representative multiple times to clarify the phrase that the sales representative continually repeated to explain the source of the alleged price savings: "allow ComEd to access Major Energy resources." She told Mr. M. it means "we buy out ComEd and we use Major Energy resources to give you an automatic rate reduction, sir, so instead of .0882 it will go down to .0657." Mr. M. asks the sales representative, "my current provider is MCSquared Energy Services [another ARES], am I changing my provider?" The sales representative falsely responds: "No, not at all sir, you are not changing providers. We are just giving you a lower rate."

120.    Later in the same call, Mr. M. is asked during the third-party verification (through an automated system): "Do you authorize Major Energy to become the electric supplier for your account?" Mr. M. responds: "This is a contradiction with what I talked about with the lady." The sales representative interrupts the third-party verification to tell Mr. M.: "sir you are not changing your electric bill, we are just representing for Major Energy, you're still going to be with your same provider just as you always have." Resigned, he proceeds with the third-party verification.

121.    Even after the verification is complete, Mr. M. remains confused asking: "What is Major Energy providing as compared to what MCSquared Energy Service is providing?" The representative responds: "We are working along, we're not the utility company, we work along with the utility company to get rate reductions and qualify people for those rate reductions, sir, that's simply all it is." Mr. M. further tells her: "You're kind of acting like you are acting on behalf of ComEd and not on behalf of yourselves and that this is the only option available." The

sales agent responds: "It's not the only option sir, it's just a numbers game, we reached you first, another company may call you in a week asking, trying to give you around the same, but it's all prolonged in the system, sir. First come, first serve." Sighing heavily, Mr. M. concludes the call stating, "Well, I'll give more consideration to this next year," apparently unaware he has already completed the process for Major to complete the switch.

122.    On another recorded call in April 2016, with Ms. K, a senior citizen, the sales representative repeatedly interrupted Ms. K.'s questions and told her not to worry. Despite Ms. K's evident confusion, the sales representative proceeds with coaching Ms. K through the verification progress. Once the verification is completed, the sales representative thanks Ms. K. for her "continued business with Major Energy" and instructs her, "Remember, don't provide your information to avoid illegal switching. Do not show your bill to anybody."

123.    During a "win back" call in November 2016, Mrs. T. asked the Major sales representative four separate times whether the representative was from ComEd. Each time, the Major sales representative falsely assured Mrs. T. that the representative was from ComEd. Mrs. T. had good reason to be cautious, since she had intentionally cancelled her Major account due to the exorbitant bills she had been receiving. Indeed, Mrs. T. was so unequivocal in her intent to remain with ComEd—and not purchase her electric supply from an ARES—that she reemphasized this point several different times during the call. Despite Mrs. T.'s clearly expressed wish to remain with ComEd as her electric supplier, the Major sales representative refused to take "no" for an answer. Having falsely represented herself to be a ComEd agent, the Major sale representative then aggressively pressed Mrs. T. for almost forty minutes to proceed through the verification process and sign up for an expressly unwanted Major account.

124.    During a "win back" call in January 2017, Mr. Q. informed a Major sales representative that his wife had cancelled their account. Yet the Major sales representative announced to Mr. Q. that she was going to reinstate the account anyway, notwithstanding his wife's wishes: "Since you are the husband," she insists, "you can reinstate the account so we can provide you a lower, competitive rate that I mentioned to you earlier, okay?" The Major Energy representative then pushes a confused and overwhelmed Mr. Q. into the verification process without obtaining clear consent.

125.    During another "win-back" call in January 2017, a Major sales representative unilaterally announced to Mr. H., a senior citizen, that she was going to "reinstate" his account—even though Mr. H. was noticeably confused by the call and had not given any indication that he wished to have his account "reinstated." The Major sales representative quickly transferred Mr. H. to a third-party verifier to confirm that Mr. H. wished to "reinstate" his account. The verification process soon went awry, however, when Mr. H. gave the "wrong" answer to one of the verifier's questions. Yet Major's sales representative was undeterred by this setback. Instead, she began to coach Mr. H. on how to "properly" answer the verifier's question: "You should answer for that yes, sir, because it is what I have said. Your utility will always be ComEd and Major Energy is just your supplier. So the question of the verifier goes like this: Do you understand that your choice is voluntary and that Major Energy does not represent the utility, because Major Energy is not your utility, just supplier, right?" Notably, the representative did not bother to inquire whether Mr. H.'s decision to "reinstate" his Major Energy account was, in fact, voluntary. The Major sales representative then transferred Mr. H. back to another third-party verifier, but again Mr. H. gave a "wrong" answer—this time, clearly stating to the verifier that he did not want to sign up for a Major account. Unwilling to respect Mr. H.'s clear desire not to

enroll with Major, the sales representative again jumped in to direct Mr. H. on the "correct" response to the verifier's question: "The question of the verifier goes like this: Do you understand—I mean, do you authorize Major Energy to become the electric supplier—just a supplier, sir—for your account? That's the question, sir. So that should be a clear yes, right?" Because Major's sales representative had successfully spoon-fed him the "correct" answers, the third time around Mr. H. managed to "pass" the supposed independent, third-party verification process—and thus was signed up for a Major energy account, even though he said he didn't want one.

126.    During another "win back" call in January 2017, a Major sales representative simply ignored the explicit wishes of Mrs. W., a customer who had intentionally cancelled her Major account for a lower rate elsewhere, and had no desire to return. "This is the first time you knew that your price protection plan for Major Energy has been cancelled," the sales representative insisted, despite what Mrs. W. was clearly saying to the contrary. The Major sales representative persisted in ignoring Mrs. W.'s repeated instructions and even went so far as to scold her while trying to sign her up for a new, explicitly unwanted Major Energy contract: "So next time do not give out any information so you will not be illegally switched without your knowledge. Okay?" And when Mrs. W. hung up the phone before the representative could complete the sale, the representative called her back three times that same day in an unsuccessful effort to "reinstate" Mrs. W.'s account against her wishes.

127.    During a "win-back" call in February 2017, a Major sales representative was asked by Mrs. Y., a senior citizen living on Social Security, if she could stay with ComEd for her electricity supplier. Instead of accurately informing Mrs. Y. that she could, in fact, continue to choose ComEd to supply her electricity, the Major sales representative assured Mrs. Y. that "we,

29

Major Energy, is the one who supplies your electricity to ComEd." Mrs. Y. understandably

expressed confusion with this response, but the sales representative continued: "You've been

illegally switched to another supplier, that's why. And right now, [Mrs. Y.], you don't even have

to worry because with such a low competitive rate, I know that you would not want to cancel

your account with us." Notwithstanding Mrs. Y.'s evident confusion, the Major Energy

representative quickly funneled her call into the verification process—and thereby signed her up

for a new, year-long contract with Major Energy. A few weeks later, in March 2017, Mrs. Y.

received yet another sales call from Major demanding to know whether she had cancelled her

contract—the same one she had just signed up for in February 2017. This subsequent interaction

strongly suggests that Mrs. Y. was completely unaware that the sales call she endured in

February 2017 had culminated in her again becoming a Major customer.

128.    During a "win back" call in May 2017, Mr. M., a senior citizen, repeatedly informed the

Major sales representative that he was unaware he had an account with Major, and couldn't

understand why Major was calling him. Taking advantage of Mr. M.'s confusion, the Major sales

representative insisted that his account—which he did not remember—had been illegally

cancelled without his permission: "You actually don't have to worry here, Mr. [M.], because I

have all your information here, including your billing address and your account number. Because

we were your supplier before. It's just that someone tries to cancel and illegally switch you to

another supplier. Okay? That's why we received a cancellation notice in here. So again, the best

thing that we can do right now, Mr. [M.], since you are not aware about the cancellation, we

need to get your account back to Major Energy." The Major Energy representative then

connected Mr. M. to a third-party verifier to start the process of switching Mr. M.'s account, but

Mr. M. abruptly hung up the phone before the verification process could start. Undeterred, the

Major Energy representative immediately called him back: "I wanted you to stay just a few seconds, sir, because we will just be connecting you to our verifier to confirm all the details of what we agreed to a while ago." There was no agreement between Mr. M. and the sales representative, however, and indeed Mr. M. told the sales representative again that he did not know why she was calling him and couldn't understand what she was saying. Mr. M. then hung up the phone before the verification process could start. But even this second setback did not bring an end to Major's efforts. Five days later, the same Major Energy representative placed another call to Mr. M. to try to switch his account. And once more, Mr. M. told her he did not understand what she was saying or why she was calling him.

129.    From July 2017 through at least February 2018, Major has marketed to consumers by setting up booths or kiosks at retail stores or similar establishments. Major has acknowledged that it has received complaints about its sales representatives causing "some incidents of customer confusion" at these establishments.

## Major Uses Marketing Vendors as Its Agents

130.    Major has employed at least eight different companies since 2012 to perform telemarketing on its behalf to Illinois consumers.

131.    Major's Quality Marketing Training and Quality Control Program manual states, "Each vendor is seen as an extension of Major."

132.    Major maintains constant communication with its vendors. Each vendor participates in a mandatory weekly status call with Major and must be "on-call" for unscheduled calls related to urgent matters.

133. Major's General Policy confirms that Major's "Executive management is ultimately responsible for establishing, implementing, and maintaining the quality control system."

134. Major uses several training materials and guidance documents to instruct vendors on how to perform marketing activities on Major's behalf. All sales representatives must complete training and pass a test developed by Major and conducted by a Major employee.

135. Before a company begins door-to-door solicitations, telemarketing, or solicitations at retail establishments in Illinois on Major's behalf, Major approves the scripts or any changes to scripts that Major's sales representatives will use.

136. All sales representatives must wear a badge approved by Major.

137. Major requires its vendors to report locations of where the vendor will send its sales representatives in advance of conducting marketing activities in an area.

138. Major has the contractual right to make announced visits to its vendors' facilities, monitor its training and operations, and review and copy the records and accounts maintained by the vendor relating to Major's services.

139. Major requires its vendors to agree to cooperate with Major "to the fullest extent possible in the resolution" of any regulatory action involving Major.

140. Major has the contractual right to compel its vendors to take remedial or corrective actions in response to a government inquiry.

141. Major pays its sales representatives based on ███████████████████████ ███████████, incentivizing representatives to engage in aggressive and coercive sales tactics.

142. For example, Major's contract with a vendor, entered into on November 2015, requires the vendor to █████████████████████████████████████████ █████████████████████████.

143.    In its contractual agreement with SupportSave Solutions, the telemarketing vendor that performs "win-back" calls on Major's behalf, Major directly pays ███████████ ████████████████████████████. Major also provides SupportSave Solutions with ████████████████████████████████ needed to make the "win-back" calls.

144.    One of Major's longest-standing business partners, the President and CEO of Direct Sales Solutions, Shai Fishman, disclosed to Major that ██████████████████ █████████████████████████████████████████████████████ ██████████████████████████████████████████ Major not only continued to use Direct Sales Solutions as a vendor, it negotiated a contract with Direct Sales Solutions that ████████████████████████████████.

145.    Under the contract between Major and Direct Sales Solutions entered into in April 2013, certain actions committed by either party are considered a breach for which the contract allows the non-breaching party to terminate the contract. However, the contract creates an exception under which certain unlawful behavior does not rise to the level of a breach. Specifically, the relevant contract provision states that Direct Sales Solutions ██████████████████ ████████████████████████ ██████████████████████████████ █████████████████████████████████ ████████████████████████████████ ██████████████████████████████████ ████████████████████████████████ ██████████████████████████████ ████████████████████████

146.    In agreeing to this contractual provision, Major permitted Direct Sales Solutions to commit certain "infractions" without the risk of Major terminating its contract with Direct Sales Solutions. Based on Shai Fishman's email, Major knew that Direct Sales Solutions ███████████

████████████████████. Not only did Major proceed with hiring Direct Sales Solutions as

an agent, but Major condoned Direct Sales Solution's unlawful conduct by agreeing to the

contractual provision ██████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

███████████████████████.

147.    In August 2014, ICC Staff issued a report identifying significant and repeated violations

of laws regarding Major's marketing practices.  ICC Staff based the report on an investigation

and review of Major's door-to-door sales script, third-party verification script, and sales

agreement that included terms and conditions of the sale. Illinois Commerce Commission,

Consumer Services Division and Office of Retail Market Development, "Staff Report to the

Commission," August 13, 2014 (Docket No. 14-0512).

148.    In its report, ICC Staff concluded the materials it reviewed indicated that Major: used

misrepresentations and deceptive language in its sales scripts; exploited language barriers; failed

to disclose requisite information during door-to-door solicitations; failed to disclose certain

information in its contracts; and failed to properly train its sales representatives.

149.    Based on staff's recommendations, on August 19, 2014, the ICC initiated a proceeding to

determine whether Major had violated Illinois law. (Docket No. 14-0512).

150.    On April 15, 2015, the ICC, along with the Citizens Utility Board ("CUB"), entered into

a settlement agreement with Major wherein Major was required to pay refunds to consumers and

adopt certain practices to remedy its conduct. The Office of the Attorney General was not a party

to the settlement. "Stipulation and Settlement of all Issues," April 15, 2015 (Docket No. 14-

0512).

151.    The misconduct detailed in this complaint continued even after Major's April 15, 2015 settlement with the ICC and CUB.

152.    Accordingly, Major has a documented history of engaging in deceptive conduct, which continued even after the ICC put Major on notice about its unlawful practices and Major agreed to change its practices.

## COUNT I – CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT

153.    Plaintiff re-alleges and incorporates by reference the allegations in Paragraphs 1 to 152.

154.    While engaged in trade or commerce, Major has committed unfair and deceptive acts or practices declared unlawful under Section 2 of the Consumer Fraud Act, 815 ILCS 505/2, by in the course of marketing, selling, and promoting electricity supply to Illinois residents, making the following misrepresentations or omissions, with the intent that consumers rely on these misrepresentations and omissions:

A.  Representing, expressly or by implication, that consumers would save money with Major when Major's charges were routinely higher than the default utility rate for electricity supply;

B.  Representing, expressly or by implication, that Major is affiliated with the consumer's utility;

C.  Representing, expressly or by implication, that consumers were entitled to savings on their electric bill under state law;

D.  Representing, expressly or by implication, that consumers were entitled to savings through an energy choice program;

E. Representing, expressly or by implication, that consumers were sent information about Major prior to the call or visit from the Major sales representative;

F. Representing, expressly or by implication, that Major was obtaining the consumer's utility account information in order to apply a discount to the consumer's existing electricity service with ComEd, when in fact the consumer was enrolling in a new, more expensive, service;

G. Representing, expressly or by implication, that the sales representative was confirming the customer's utility account number, rather than seeking authorization to enroll the consumer in a new contract;

H. Failing to disclose to consumers the material fact that they would be charged a "Monthly Service Fee" in addition to the monthly electricity use charges;

I. Failing to disclose the material fact of what rates consumers would be charged;

J. Failing to disclose the material fact of the length of the contract that consumers are entering into; and,

K. Representing, expressly or by implication, that submission of a customer's utility account number is necessary to receive a price quote on a rate offer.

155. While engaged in trade or commerce, Major has committed unfair acts or practices declared unlawful under Section 2 of the Consumer Fraud Act, 815 ILCS 505/2, by, in the course of marketing, selling, and promoting electricity supply to Illinois residents, representing that consumers can save money through an introductory rate, and then moving the consumer to a variable rate that:

A. Was not clearly and conspicuously disclosed in the renewal materials sent at the time their introductory rate was ending; and,

36

B. In fact was higher or significantly higher than the rate the consumer was previously paying under the introductory rate.

156.    While engaged in trade or commerce, Major has committed unfair and deceptive trade practices declared unlawful under Section 2 of the Consumer Fraud Act, 815 ILCS 505/2 as defined by Section 2 of Uniform Deceptive Trade Practices Act, 815 ILCS 510/2, in the course of marketing, selling, and promoting electricity supply to Illinois residents:

A. Passing off goods or services as those of either ComEd or another ARES;

B. Causing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of its electricity supply services;

C. Causing likelihood of confusion or of misunderstanding as to affiliation, connection, or association with or certification by ComEd or another ARES;

D. Representing Major's services have sponsorship, approval, characteristics, uses, or benefits that they do not have;

E. Disparaging the goods, services, or business of another by false or misleading representation of fact by claiming to offer lower prices and claiming that other ARES are engaged in illegal switching.

F. Making false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions; and,

G. Engaging in conduct which creates a likelihood of confusion or misunderstanding.

157.    WHEREFORE, the plaintiff prays that this honorable Court enter an Order:

A. Finding that the defendant has violated Section 2 of the Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/2, and as further defined by Section

2 of Uniform Deceptive Trade Practices Act, 815 ILCS 510/2, by engaging in the unlawful acts and practices alleged herein;

B. Preliminarily and permanently enjoining the defendant from engaging in the deceptive and unfair practices alleged herein;

C. Revoking defendant's Certificate of Service Authority to operate as an alternative retail electric supplier in the State of Illinois;

D. Declaring that all contracts entered into between the defendant and Illinois consumers by the use of methods and practices declared unlawful are rescinded and requiring that full restitution be made to said consumers;

E. Assessing a civil penalty as provided in Section 7 of the Consumer Fraud Act, 815 ILCS 505/7, of up to $50,000 per deceptive act or practice and an additional amount of $50,000 for each act or practice found to have been committed with intent to defraud;

F. Assessing an additional civil penalty in the amount of Ten Thousand Dollars ($10,000) per violation of the Consumer Fraud Act found by the Court to have been committed by the defendant against a person 65 years of age and older as provided in Section 7(c) of the Consumer Fraud Act, 815 ILCS 505/7(c);

G. Assessing an additional civil penalty as provided in Section 2FF of the Consumer Fraud Act, 815 ILCS 505/2FF, of $50,000 per violation;

H. Requiring the defendant to pay all costs for the prosecution and investigation of this action, as provided by Section 10 of the Consumer Fraud Act, 815 ILCS 505/10; and

I. Providing such other and further equitable relief as justice and equity may require.

**COUNT II-CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT SECTION 2EE**

158.    Plaintiff re-alleges and incorporates by reference the allegations in Paragraphs 1 to 152.

159.    While engaged in trade or commerce, Major has committed unfair and deceptive acts or

practices declared unlawful under Section 2 of the Consumer Fraud Act, 815 ILCS 505/2EE, by,

in the course of marketing, selling, and promoting electricity supply to Illinois residents, making

the following misrepresentations or omissions, with the intent that consumers rely on these

misrepresentations and omissions:

    A. Failing to disclose all materials terms and conditions of the offer to consumers before

       obtaining consent to execute a change in their supply service;

    B. Failing to obtain consumers' express agreement to execute a change in their supply

       service; and,

    C. Failing to drop off the call once the 3-way connection has been established.

160.    WHEREFORE, the plaintiff prays that this honorable Counter enter an Order:

    A. Finding that the defendant has violated Section 2EE of the Consumer Fraud and

       Deceptive Business Practices Act, 815 ILCS 505/2EE, by engaging in the unlawful

       acts and practices alleged herein;

    B. Preliminarily and permanently enjoining the defendant from engaging in the

       deceptive and unfair practices alleged herein;

    C. Revoking defendant's Certificate of Service Authority to operate as an alternative retail

       electric supplier in the State of Illinois;

    D. Declaring that all contracts entered into between the defendant and Illinois consumers

       by the use of methods and practices declared unlawful are rescinded and requiring

       that full restitution be made to said consumers;

E. Assessing a civil penalty as provided in Section 7 of the Consumer Fraud Act, 815 ILCS 505/7, of up to $50,000 per deceptive act or practice and an additional amount of $50,000 for each act or practice found to have been committed with intent to defraud;

F. Assessing an additional civil penalty in the amount of Ten Thousand Dollars ($10,000) per violation of the Consumer Fraud Act found by the Court to have been committed by the defendant against a person 65 years of age and older as provided in Section 7(c) of the Consumer Fraud Act, 815 ILCS 505/7(c);

G. Assessing an additional civil penalty as provided in Section 2FF of the Consumer Fraud Act, 815 ILCS 505/2FF, of $50,000 per violation;

H. Requiring the defendant to pay all costs for the prosecution and investigation of this action, as provided by Section 10 of the Consumer Fraud Act, 815 ILCS 505/10; and

I. Providing such other and further equitable relief as justice and equity may require.

## COUNT III-CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT SECTION 2P

161.    Plaintiff re-alleges and incorporates by reference the allegations in Paragraphs 1 to 152.

162.    While engaged in trade or commerce, Major has committed unfair and deceptive acts or practices declared unlawful under Section 2P of the Consumer Fraud Act, 815 ILCS 505/2P, by, in the course of marketing, selling, and promoting electricity supply to Illinois residents, failing to clearly and conspicuously disclose all material terms and conditions at the outset of an offer of free prizes, gifts, or gratuities, so as to leave no reasonable probability that the offering might be misunderstood.

163.    WHEREFORE, the plaintiff prays that this honorable Counter enter an Order:

40

A. Finding that the defendant has violated Section P of the Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/2, by engaging in the unlawful acts and practices alleged herein;

B. Preliminarily and permanently enjoining the defendant from engaging in the deceptive and unfair practices alleged herein;

C. Revoking defendant's Certificate of Service Authority to operate as an alternative retail electric supplier in the State of Illinois;

D. Assessing a civil penalty as provided in Section 7 of the Consumer Fraud Act, 815 ILCS 505/7, of up to $50,000 per deceptive act or practice and an additional amount of $50,000 for each act or practice found to have been committed with intent to defraud;

E. Assessing an additional civil penalty in the amount of Ten Thousand Dollars ($10,000) per violation of the Consumer Fraud Act found by the Court to have been committed by the defendant against a person 65 years of age and older as provided in Section 7(c) of the Consumer Fraud Act, 815 ILCS 505/7(c);

F. Assessing an additional civil penalty as provided in Section 2FF of the Consumer Fraud Act, 815 ILCS 505/2FF, of $50,000 per violation;

G. Requiring the defendant to pay all costs for the prosecution and investigation of this action, as provided by Section 10 of the Consumer Fraud Act, 815 ILCS 505/10; and

H. Providing such other and further equitable relief as justice and equity may require.

## COUNT IV – TELEPHONE SOLICITATIONS ACT

164. Plaintiff re-alleges and incorporates by reference the allegations in Paragraphs 1 to 152.

165. While engaged in trade or commerce, Major has violated Section 15 of the Telephone Solicitations Act, 815 ILCS 413/15, by, in the course of marketing, selling, and promoting electricity supply to Illinois residents:

    A. Failing to identify the name of the business or organization being represented during the sales pitch to Illinois consumers; and

    B. Failing to inquire at the beginning of the call whether the person consents to the solicitation.

166. A violation of the Telephone Solicitations Act is an unlawful practice under Section 2Z of the Consumer Fraud Act, 815 ILCS 413/25(e) and 815 ILCS 505/2Z.

167. WHEREFORE, the plaintiff prays that this honorable Counter enter an Order:

    A. Finding that the defendant has violated Section 15 of the Telephone Solicitations Act, 815 ILCS 413/15, by engaging in the unlawful acts and practices alleged herein;

    B. Preliminarily and permanently enjoining the defendant from engaging in the deceptive and unfair practices alleged herein;

    C. Revoking defendant's Certificate of Service Authority to operate as an alternative retail electric supplier in the State of Illinois;

    D. Declaring that all contracts entered into between the defendant and Illinois consumers by the use of methods and practices declared unlawful are rescinded and requiring that full restitution be made to said consumers;

    E. Assessing a civil penalty as provided in Section 7 of the Consumer Fraud Act, 815 ILCS 505/7, of up to $50,000 per deceptive act or practice and an additional amount of $50,000 for each act or practice found to have been committed with intent to defraud;

F. Assessing an additional civil penalty in the amount of Ten Thousand Dollars ($10,000) per violation of the Consumer Fraud Act found by the Court to have been committed by the defendant against a person 65 years of age and older as provided in Section 7(c) of the Consumer Fraud Act, 815 ILCS 505/7(c);

G. Assessing an additional civil penalty as provided in Section 2FF of the Consumer Fraud Act, 815 ILCS 505/2FF, of $50,000 per violation;

H. Requiring the defendant to pay all costs for the prosecution and investigation of this action, as provided by Section 10 of the Consumer Fraud Act, 815 ILCS 505/10; and

I. Providing such other and further equitable relief as justice and equity may require.

## COUNT V – AUTOMATIC CONTRACT RENEWAL ACT

168. Plaintiff re-alleges and incorporates by reference the allegations in Paragraphs 1 to 152.

169. While engaged in trade or commerce, Major has violated Section 10 of the Automatic Contract Renewal Act, 815 ILCS 605/10, by, in the course of marketing, selling, and promoting electricity supply to Illinois residents, making the following misrepresentations or omissions, with the intent that consumers rely on these misrepresentations and omissions:

A. Failing to clearly and conspicuously disclose in the written contract the automatic renewal clause, including the cancellation procedure.

170. A violation of the Automatic Contract Renewal Act is an unlawful practice under Section 2Z of the Consumer Fraud Act, 815 ILCS 601/15 and 815 ILCS 505/2Z.

171. WHEREFORE, the plaintiff prays that this honorable Counter enter an Order:

A. Finding that the defendant has violated Section 10 of the Automatic Contract Renewal Act, 815 ILCS 605/10, by engaging in the unlawful acts and practices alleged herein;

43

B. Preliminarily and permanently enjoining the defendant from engaging in the deceptive and unfair practices alleged herein;

C. Revoking defendant's Certificate of Service Authority to operate as an alternative retail electric supplier in the State of Illinois;

D. Declaring that all contracts entered into between the defendant and Illinois consumers by the use of methods and practices declared unlawful are rescinded and requiring that full restitution be made to said consumers;

E. Assessing a civil penalty as provided in Section 7 of the Consumer Fraud Act, 815 ILCS 505/7, of up to $50,000 per deceptive act or practice and an additional amount of $50,000 for each act or practice found to have been committed with intent to defraud;

F. Assessing an additional civil penalty in the amount of Ten Thousand Dollars ($10,000) per violation of the Consumer Fraud Act found by the Court to have been committed by the defendant against a person 65 years of age and older as provided in Section 7(c) of the Consumer Fraud Act, 815 ILCS 505/7(c);

G. Assessing an additional civil penalty as provided in Section 2FF of the Consumer Fraud Act, 815 ILCS 505/2FF, of $50,000 per violation;

H. Requiring the defendant to pay all costs for the prosecution and investigation of this action, as provided by Section 10 of the Consumer Fraud Act, 815 ILCS 505/10; and

I. Providing such other and further equitable relief as justice and equity may require.

### COUNT VI – PRIZES AND GIFTS ACT

172. Plaintiff re-alleges and incorporates by reference the allegations in Paragraphs 1 to 152.

173.    While engaged in trade or commerce, Major has violated Section 25 of the Prizes and Gifts Act, 815 ILCS 525/25, by, in the course of marketing, selling, and promoting electricity supply to Illinois residents, failing to disclose the following information in a clear and conspicuous statement at the outset of the offer:

A. The address of the sponsor's actual principal place of business;

B. The retail value of each prize the person receiving the notice has been selected to receive or may be eligible to receive;

C. A disclosure that no purchase is necessary to enter such written promotional offer;

D. A disclosure that a purchase will not improve the person's chances of winning with an entry;

E. A statement of the person's odds of receiving each prize identified in the notice;

F. Any requirement that the person pay the actual shipping or handling fees or any other charges to obtain or use a prize, including the nature and amount of the charges;

G. If receipt of the prize is subject to a restriction, a description of the restriction; and

H. Any limitations on eligibility.

174.    A violation of the Prizes and Gifts Act is an unlawful practice under the Consumer Fraud Act, 815 ILCS 525/40.

175.    WHEREFORE, the plaintiff prays that this honorable Counter enter an Order:

A. Finding that the defendant has violated Section 25 of the Prizes and Gifts Act, 815 ILCS 525/25, by engaging in the unlawful acts and practices alleged herein;

B. Preliminarily and permanently enjoining the defendant from engaging in the deceptive and unfair practices alleged herein;

C. Revoking defendant's Certificate of Service Authority to operate as an alternative retail electric supplier in the State of Illinois;

D. Assessing a civil penalty as provided in Section 7 of the Consumer Fraud Act, 815 ILCS 505/7, of up to $50,000 per deceptive act or practice and an additional amount of $50,000 for each act or practice found to have been committed with intent to defraud;

E. Assessing an additional civil penalty in the amount of Ten Thousand Dollars ($10,000) per violation of the Consumer Fraud Act found by the Court to have been committed by the defendant against a person 65 years of age and older as provided in Section 7(c) of the Consumer Fraud Act, 815 ILCS 505/7(c);

F. Assessing an additional civil penalty as provided in Section 2FF of the Consumer Fraud Act, 815 ILCS 505/2FF, of $50,000 per violation;

G. Requiring the defendant to pay all costs for the prosecution and investigation of this action, as provided by Section 10 of the Consumer Fraud Act, 815 ILCS 505/10; and

H. Providing such other and further equitable relief as justice and equity may require.

Respectfully submitted,

THE PEOPLE OF THE STATE OF ILLINOIS, by
LISA MADIGAN, ATTORNEY GENERAL OF
ILLINOIS

BY: __/s/ Aaron Chait_____

Aaron Chait
Anna P. Crane
Darren Kinkead
Caitlyn McEllis

Thomas J. Verticchio
Ronald D. Jolly
Assistant Attorneys General
100 West Randolph Street, 11th Floor
Chicago, Illinois 60601
Phone: (312) 814-3000
Attorney No: 99000
achait@atg.state.il.us
acrane@atg.state.il.us
dkinkead@atg.state.il.us
cmcellis@atg.state.il.us
tverticchio@atg.state.il.us
rjolly@atg.state.il.us