E-FILED
Wednesday, 14 May, 2025  03:09:27 PM
Clerk, U.S. District Court, ILCD

# EXHIBIT B

FILED
1/16/2025 9:56 AM
Mariyana T. Spyropoulos
CIRCUIT CLERK
COOK COUNTY, IL
2025CH00428
Calendar, 16
31000796

For updated information about your case, including hearings, subsequent filings and other case information, please visit our Online Case Search and search for your case: https://casesearch.cookcountyclerkofcourt.org

FILED DATE: 1/16/2025 9:56 AM    2025CH00428

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, CHANCERY DIVISION

PEOPLE OF THE STATE OF ILLINOIS, *ex rel.* KWAME RAOUL, Attorney General of the State of Illinois,

    Plaintiff,

    v.

SPARK ENERGY, LLC and SPARK ENERGY GAS, LLC, Texas limited liability corporations,

    Defendants.

No. 2025CH00428

### COMPLAINT FOR PERMANENT INJUNCTION
### AND OTHER EQUITABLE RELIEF

Plaintiff, the People of the State of Illinois, by and through Kwame Raoul, Attorney General of the State of Illinois, brings this action against Defendants Spark Energy, LLC ("Spark Energy") and Spark Energy Gas, LLC ("Spark Gas") (collectively "Spark"), for violations of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 *et seq.* ("Consumer Fraud Act" or "CFA"), and the Illinois Telephone Solicitations Act, 815 ILCS 413/1 *et seq.* ("Telephone Solicitations Act" or "TSA").

### INTRODUCTION

1.    This is a consumer fraud lawsuit against Spark for deploying fraudulent, unfair, and deceptive business practices to dupe Illinois consumers into paying inflated prices for electricity and gas. For over 10 years, Spark has deployed a wide variety of predatory sales tactics, including enrolling unwitting consumers in Spark services without their knowledge or consent, increasing consumers' electricity rates by more than twenty percent without providing any advance notice to consumers, taking advantage of senior consumers, and promising lower rates and savings to consumers when, in reality, Spark consumers have paid millions of dollars more for electricity and gas than consumers who used the public utility as their supplier.

1

FILED DATE: 1/16/2025 9:56 AM   2025CH00428

2.      Spark is an Alternative Retail Electric Supplier ("ARES") and Alternative Gas Supplier ("AGS"), which means that Illinois consumers can choose to receive their electricity and gas from Spark instead of their default public utility, such as ComEd for electricity, or Peoples Gas, North Shore Gas, and Nicor Gas for natural gas. Though residential electricity and gas was traditionally supplied exclusively by these state-regulated public utilities, the Illinois legislature opened the State's energy market to private competition in 1997. This allowed Illinois consumers the choice of purchasing their electricity and gas from a variety of alternative, private suppliers. Since then, numerous ARES and AGS like Spark have flocked to Illinois to persuade consumers to select them as their electricity and gas supplier via telemarketing and in-person solicitations.

3.      There is no difference in the electricity or gas that Spark supplies compared to the electricity or gas that the public utilities supply. The source and quality of the energy is the same, and is delivered on the same transmission lines, so the primary reason a consumer switches to an ARES or AGS like Spark is because of a false promise that prices offered in a competitive market are lower than the prices offered by a public utility.

4.      Spark has taken advantage of Illinois's deregulated energy market by luring Illinois consumers into switching their electric and gas supply to Spark through misrepresentations, omissions of material fact, and other deceptive and unfair practices. Spark has tricked thousands of Illinois consumers into paying millions more for their electricity and gas than they would have paid if they had remained enrolled with their default public utility as a supplier. Some consumers even end up paying for Spark's exorbitant prices without their knowledge or consent: hundreds of consumers complained to the Illinois Commerce Commission ("ICC") that Spark enrolled them without their authorization, a tactic known as "slamming."

FILED DATE: 1/16/2025 9:56 AM   2025CH00428

5.      Consumers who switched to Spark virtually always paid more than they would have paid if they had remained with the public utility—*a lot more*. For example, during the first two years of the COVID-19 pandemic, from March 2020 through February 2022, Spark's electricity customers collectively paid over $32 million more than they would have if they had remained with their default public utility for electric supply; Spark's natural gas customers collectively paid over $7 million more during that same period.

6.      Accordingly, the State brings this action to stop Spark's predatory and illegal conduct, recover the tens of millions of dollars in increased costs that Illinois consumers have paid as a result of Spark's illegal conduct, require Spark to pay civil penalties pursuant to the Illinois Consumer Fraud Act and the Illinois Telephone Solicitations Act, revoke Spark's authority to operate in the State, and for other relief as alleged herein.

## PARTIES

7.      Plaintiff, the People of the State of Illinois, by Kwame Raoul, the Attorney General of the State of Illinois, is authorized to enforce the Consumer Fraud Act and the Telephone Solicitations Act. 815 ILCS 505/7; 815 ILCS 413/25(e).

8.      Defendant Spark Energy, LLC, is a limited liability company with its principal place of business in Houston, Texas. The ICC certified Spark Energy, LLC to market and sell electricity to residential consumers in areas where ComEd, a public electric utility, operates. From about 2008 to 2018, Spark Energy, LLC operated in Illinois as Spark Energy, LP, until it was converted from a Texas-based limited partnership to a Texas-based limited liability company. At all relevant times, Spark Energy, LLC was engaged in trade and commerce in Illinois by marketing, selling, and promoting electric supply to Illinois residents.

FILED DATE: 1/16/2025 9:56 AM  2025CH00428

9.     Defendant Spark Energy Gas, LLC, is a limited liability company with its principal place of business in Houston, Texas. The ICC has certified Spark Energy Gas, LLC to market and sell natural gas to residential consumers in areas where Nicor Gas, Peoples Gas, and North Shore Gas, public utilities for natural gas, operate. From about 2008 to 2018, Spark Energy Gas, LLC operated in Illinois as Spark Energy Gas, LP, until it was converted from a Texas-based limited partnership to a Texas-based limited liability company. At all relevant times, Spark Energy Gas, LLC was engaged in trade and commerce in Illinois by marketing, selling, and promoting natural gas supply to Illinois residents.

10.     For purposes of this Complaint, "Spark" references both Spark Energy, LLC and Spark Energy Gas, LLC. Although Spark Energy is an ARES and Spark Gas is an AGS, the two entities often operate as one. Both limited liability companies were formed in May 2014, having previously existed as limited partnerships, and both are entirely owned by Spark HoldCo, LLC. Both entities share the same principal address, registered agent, and manager, and the entities contract together with third party vendors.

11.     For purposes of this Complaint, any references to Spark's acts and practices shall mean acts and practices by and through Spark's officers, owners, members, directors, employees, representatives and/or other agents, including third-party vendors retained by Spark to market electricity or natural gas supply on Spark's behalf.

**PUBLIC INTEREST**

12.     The Illinois Attorney General believes this action to be in the public interest of the citizens of the State of Illinois and brings this lawsuit pursuant to the Illinois Consumer Fraud Act and the Illinois Telephone Solicitations Act. 815 ILCS 505/7; 815 ILCS 413/25(e).

4

FILED DATE: 1/16/2025 9:56 AM   2025CH00428

## JURISDICTION AND VENUE

13.    This Court has jurisdiction over this action pursuant to the Court's general jurisdiction and pursuant to 815 ILCS 505/1 *et seq.* and 815 ILCS 413/1 *et seq.* This cause of action arises from Spark Energy and Spark Gas's actions in Illinois.

14.    This Court has personal jurisdiction over Spark Energy and Spark Gas because both entities do business in Illinois, including in Cook County.

15.    Venue for this action is proper in Cook County pursuant to Section 2-101 of the Illinois Code of Civil Procedure, 735 ILCS 5/2-101, because Spark Energy and Spark Gas conduct business in Cook County and some of the transactions out of which this action arises occurred in Cook County.

## TRADE AND COMMERCE

16.    The Consumer Fraud Act, 815 ILCS 505/1(f), defines "trade" and "commerce" as:

> [T]he advertising, offering for sale, sale, or distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value wherever situated, and shall include any trade or commerce directly or indirectly affecting the people of this State.

17.    At all times relevant to this Complaint, Spark Energy and Spark Gas were engaged in trade and commerce in the State of Illinois within the meaning of the Consumer Fraud Act by marketing, selling, and promoting electricity or natural gas supply to Illinois residents.

## THE ALTERNATIVE ELECTRIC AND GAS SUPPLY INDUSTRY

18.    Each public utility in Illinois has a defined area of electricity and gas consumers that it services. Traditionally, electric and gas utilities have provided their consumers with both (1) the electric or natural gas supply, meaning the electricity or natural gas itself, and (2) the distribution service that delivers the electricity or natural gas.

FILED DATE: 1/16/2025 9:56 AM    2025CH00428

19.    The ICC reviews and approves the prices that public electric and gas utilities may charge eligible residential customers for the electric or gas supply. This default utility rate reflects the utility's cost for purchasing the electricity or gas.

20.    Public electric utilities, like ComEd, or public gas utilities, like Nicor or Peoples Gas, are the default suppliers of electricity and gas to Illinois consumers. However, under the Illinois Electric Service Customer Choice and Rate Relief Law of 1997, 220 ILCS 5/16-101 *et seq.*, consumers may choose to purchase their electric or gas supply from an ARES or AGS, rather than their default public utility. If a consumer decides to switch to an ARES or AGS, the consumer continues to pay the default public utility for *delivery* service but pays the ARES or AGS for the electricity or gas itself.

21.    Regardless of which entity the consumer selects as their supplier, the default public utility continues to deliver electricity or gas to the consumer's home. Even if a consumer enrolls with an ARES or AGS, the default public utility continues to bill and collect from the consumer the total of the supply charge (as set by the ARES or AGS), plus the delivery charge from the utility, and other fees and taxes.

22.    Because the consumer continues to receive one bill from their default public utility, and their bill looks virtually the same even if they are enrolled with an ARES or AGS, consumers are often confused and may not discover right away that an ARES or AGS has fraudulently enrolled them without their consent.

23.    Consumers often discover that they have been enrolled in an ARES or AGS after receiving high utility bills. Because ARES and AGS rates are not regulated by the ICC like public utility rates, ARES and AGS rates can be, and almost always are, set much higher than the public utility rates. These higher rates impact Illinois consumers beyond those enrolled in ARES or AGS

FILED DATE: 1/16/2025 9:56 AM   2025CH00428

services: when ARES and AGS enroll consumers who participate in state programs that provide financial utility assistance for low-income individuals, like the Low Income Home Energy Assistance Program ("LIHEAP") or the Percentage of Income Payment Plan ("PIPP"), the higher ARES and AGS rates deplete the finite LIHEAP and PIPP funds at a quicker rate, resulting in fewer Illinois consumers served by these critical programs.

## SPARK'S BUSINESS PRACTICES

24.     The ICC granted Spark Gas a Certificate of Service Authority around 2017 and eventually granted Spark Energy a Certificate of Service Authority around February 2018, after denying its initial application in August 2017 because of customer complaints and Spark Energy's failure to demonstrate the required managerial qualifications.[1] The Certificates of Authority allow Spark to operate as an ARES and AGS and sell electricity and gas to eligible residential customers in the ComEd, North Shore Gas, Peoples Gas, and Nicor Gas service areas. The certificates also require that Spark comply with all enumerated requirements for certification and "all other applicable laws and regulations" pursuant to 220 ILCS 5/16-115(d)(11) and 220 ILCS 5/16-115A(a)(ii).

25.     Since about 2008, Spark has marketed to and enrolled tens of thousands of residential consumers in the ComEd, North Shore Gas, Nicor Gas, and Peoples Gas service areas in its electric and gas supply services.

26.     Spark charges its customers based on how much electricity (measured in kilowatt hours, or "kWh") or natural gas (measured in "therms") the customer uses each month. Spark offers two options for its supply services: (1) fixed rates, which offer consumers the same price

---

[1] As detailed above, Spark Energy and Spark Gas are the successor companies to Spark Energy, LP and Spark Energy Gas LP, which the ICC had certified to operate in Illinois from about 2008 through 2018, until the limited partnerships were converted into limited liability companies.

per kWh or therm over a set number of months, and (2) variable rates, which offer consumers a different rate per kWh or per therm from month to month.

27.     The ICC and the Attorney General's office have received complaints from consumers about Spark's business practices.

**Spark Directed and Controlled Vendors Who Served as its Sales Agents**

28.     Spark has hired and utilized sales agents and vendors who engaged in a wide variety of predatory sales tactics to enroll Illinois consumers in its electric and gas supply services.

29.     Enrolling a consumer in ARES or AGS services typically requires two steps. First, a sales agent attempts to convince the consumer to enroll with the ARES or AGS supply service. Then, the ARES or AGS "confirms" the consumer's enrollment using a statutorily required and independent third-party verification ("TPV") call, or a written confirmation called a letter of agency.

30.     For the first step of the solicitation, Spark Energy and Spark Gas had several internal employees who conducted telemarketing solicitations. Spark also contracted with and employed third-party sales agents as its representatives to market and sell its electricity and gas to Illinois consumers in-person and over the phone.

31.     Spark trained, directed, and controlled how its sales agents marketed and promoted its products. Spark detailed the duties and obligations of its sales agents in its contracts and codes of conduct. Spark also provided scripts to its sales agents, which instructed them on how to interact with consumers and how to market Spark's products and services. The scripts instructed Spark's sales agents to expressly identify themselves as Spark's representatives.

32.     Spark was responsible for overseeing its sales agents' statutory obligations and compliance with the law.

FILED DATE: 1/16/2025 9:56 AM   2025CH00428

FILED DATE: 1/16/2025 9:56 AM    2025CH00428

33.    For the second part of the solicitation, the third-party verifier that confirms the consumer's enrollment is independent from both the ARES or AGS and its sales agent. The verifier's intended role is to ensure that the consumer understands and agrees to the terms of the sale. Laws regulating this verification process seek to prevent an ARES or AGS like Spark from enrolling consumers in its service without the consumer's knowledge or consent.

34.    Spark was responsible for selecting and contracting with the third parties that performed these verifications.

35.    Once a sale was completed and the enrollment was "verified," the vendor set the consumer's information to Spark to complete the enrollment.

36.    Spark was responsible for reviewing consumer enrollments in its electricity and gas supply services, including reviewing recorded telephone solicitations and verifications to ensure compliance with the law. Spark was responsible for terminating any sales agent or verifier that failed to comply with the law.

37.    Spark typically paid its vendors and sales agents by commission for each consumer enrollment, incentivizing agents to engage in the aggressive and deceptive sales tactics detailed below.

38.    For years, Spark has buried its head in the sand, ignoring consumer complaints that detailed patterns of problematic sales tactics, overlooking predatory conduct recorded on telephone solicitations, and dragging its feet on terminating sales agents and vendors that repeatedly violated the law.

### Spark's Fraudulent Conduct

39.    Spark and its sales agents have engaged in various unfair or deceptive acts or practices, including but not limited to the use of deception, fraud, false pretense, false promise,

FILED DATE: 1/16/2025 9:56 AM    2025CH00428

and misrepresentations. It also has engaged in concealment, suppression, and omissions of material fact, and similar conduct that is unfair, has a tendency to deceive, and creates a likelihood of confusion or misunderstanding, with the intent that consumers rely on those misrepresentations, omissions, and other unfair or deceptive acts or practices.

*Enrolling Consumers in Spark Services without their Knowledge or Consent ("Slamming")*

40.     Spark repeatedly violated the CFA's enrollment requirements by "slamming" consumers, meaning Spark enrolled consumers in its gas or electric services without their knowledge or consent. *See* 815 ILCS 505/2EE(a)(iv) (ARES must obtain an "express agreement to accept the offer" after disclosing all material terms); 815 ILCS 505/2DDD(d) (AGS must obtain an "express agreement to accept the offer" after disclosing all material terms).

41.     Since at least 2017 and through about 2020, over a hundred consumers reported invalid enrollments to the ICC. Spark enrolled over a hundred consumers using incorrect account information, including incorrect account holder names, addresses, and phone numbers.

42.     These consumers complained to the ICC that they became aware of the unauthorized enrollment only after reviewing subsequent utility bills, often with significantly higher rates than they had previously paid.

43.     Spark repeatedly admitted to the ICC that there were serious issues with these enrollments, including significant discrepancies between the voice of the consumer who had been enrolled, and then complained to the ICC, and the voice of the person on the sales or third-party verification recordings that Spark used to fraudulently enroll the consumers. These discrepancies indicated that Spark solicited an entirely different consumer than the consumer who Spark enrolled in its services. For example:

FILED DATE: 1/16/2025 9:56 AM   2025CH00428

a. In response to an April 19, 2018 consumer complaint, Spark admitted to the ICC that "based on the voice discrepancy of the [third party verification], the invalid telephone number and the incorrect service address . . . we have deemed the two electric enrollments and the two gas enrollments as invalid." A third-party vendor, Partner Energy, Inc., on behalf of Spark, slammed this consumer and enrolled them in Spark's services without their consent around July 2016.

b. In response to a November 26, 2019 consumer complaint for high rate charges, Spark admitted to the ICC that there were "noticeable discrepancies between the names of the person who authorized enrollment in comparison to the name of the utility account holder whom filed [the] ICC Complaint." A third-party vendor, D2DMAS, on behalf of Spark, slammed this consumer and enrolled them in Spark's services without their consent around February 1, 2018.

c. In response to a June 8, 2018 consumer complaint, Spark admitted to the ICC that there was "a noticeable discrepancy between the name of the person claiming to be authorized to enroll the electric account and a discrepancy in the name of the person's name listed on the utility invoice" and "the telephone number used to complete the [third party verification] . . . differs from the telephone number used to file this complaint." Spark deemed the enrollment invalid. A third-party vendor, Partner Energy, Inc., on behalf of Spark, slammed this consumer and enrolled them in Spark's services without their consent around May 22, 2018.

d. In response to a February 11, 2019 consumer complaint, Spark admitted to the ICC that there was a "noticeable discrepancy between the name of the person

11

FILED DATE: 1/16/2025 9:56 AM   2025CH00428

who authorized the enrollment in comparison to [the consumer who filed the complaint]; along with the difference in addresses, Spark has deemed the enrollment as a No Sale." A third-party vendor, Dark Star Marketing, LLC, on behalf of Spark, slammed this consumer and enrolled them in Spark's services without their consent around January 29, 2019.

e.   In response to an April 12, 2019 consumer complaint, Spark admitted to the ICC that there was a "noticeable discrepancy between the voice and the telephone number of the person who authorized the enrollment in comparison to the account holder. For this reason, Spark deems the enrollment as a No Sale." A third-party vendor, Energy Group Consultants, on behalf of Spark, slammed this consumer and enrolled them in Spark's services without their consent around January 3, 2019.

*Altering Telemarketing Recordings to Hide Other Deceptive Sales Tactics*

44.   Illinois law requires that Spark record and preserve its telemarketing solicitations, but hundreds of Spark's telemarketing recordings were spliced or altered to hide Spark sales agents' deceptive sales tactics in violation of Spark's recording and retention obligations. *See* 815 ILCS 2EE(c)(3).

45.   For example, hundreds of Spark's telemarketing recordings during the relevant time period lacked a natural, conversational flow between Spark's sales agents and consumers. In these recordings, the consumers did not ask *any* questions about the solicitation, answered all questions with a "yes" or "OK", and did exactly what the sales agent requested without question (such as providing their account number or grabbing their bill). It is implausible that hundreds of consumers had *no* questions about what they were being sold and it is evident that these consumers'

12

FILED DATE: 1/16/2025 9:56 AM   2025CH00428

"yes" and "OK" responses were recorded and inserted throughout the recording to give the appearance of a consensual enrollment.

46.     The ICC even flagged its concerns about suspicious sales recordings to Spark around July 2019 in response to a consumer complaint, stating that "the very beginning of the sales call doesn't flow like an ordinary cold call."

47.     Examples of Spark's altered telemarketing recordings include the following:

    a.   On or around January 3, 2020, a Spark sales agent started the telemarketing call with, "Hello this is [inaudible] calling on behalf of Spark Energy. My rep ID is 21007, OK?," to which the consumer responded, "yes." Throughout this call, the consumer answered the sales agent's questions with mostly "yes," "OK," and "alright" answers, all in the exact same tone, indicating that the consumer's recorded answers were inserted throughout the recording. The sales agent spoke quickly throughout the solicitation and the consumer did not ask one question about the solicitation.

    b.   On or around December 12, 2019, a sales agent from a third-party vendor, ROF, on behalf of Spark, started the telemarketing call with, "Hello this is Mark on the line, how are you doing today?" The consumer responded, "OK" in an awkward tone, to which the sales agent replied, "Perfect, so just for the qualification purposes can you please verify me your first name?" The consumer provided his name without asking about which "qualification purposes." Throughout this call, the consumer asked no questions about the solicitation and the consumer's "yes" and "OK" answers to the sales agent's

13

FILED DATE: 1/16/2025 9:56 AM    2025CH00428

questions appear recorded and inserted throughout the recording, as the answers were in the exact same tone each time.

c.    In an undated telemarketing recording, the Spark sales agent began the call with, "Hello, how are you doing today?", to which the consumer responded, "OK" in an awkward tone. The consumer's "yes" and "OK" responses to the sales agent throughout the call appeared recorded and inserted, as the background noise abruptly cut out when the consumer responded to the sales agent and the consumer's responses were in the same tone each time. The consumer asked no questions during the solicitation.

d.    In a July 5, 2019 telemarketing recording, the Spark sales agent began the call with, "Hello yes this is Mark calling on behalf of Spark Energy. My rep ID is 51006. How are you doing today?" The consumer responded, "OK" in an awkward tone. The consumer's "yes," "OK", and "no" responses to the sales agent throughout the call appeared recorded and inserted, as the background noise abruptly cut out when the consumer responded to the sales agent and the consumer's responses were in the same tone each time. The consumer asked no questions during the solicitation.

48.    Spark and its sales agents altered at least hundreds of telemarketing recordings during the relevant time period to conceal other deceptive sales tactics and in violation of its recording and retention obligations.

*Failing to Obtain Consumers' Consent to Telemarketing Solicitations as Required*
*by the Telephone Solicitations Act*

49.    The Telephone Solicitations Act ("TSA") requires that telemarketers (1) "immediately state . . . the purpose of the call," 815 ILCS 413/15(b)(2), and (2) request and obtain

14

FILED DATE: 1/16/2025 9:56 AM   2025CH00428

consent from a consumer before proceeding with a solicitation, 815 ILCS 413/15(b)(2) (requiring that the sales agent "inquire at the beginning of the call whether the person called consents to the solicitation").[2] A violation of the TSA constitutes a violation of the CFA. *See* 815 ILCS 413/25(e); 815 ILCS 505/2Z.

50.    These requirements are critical to clarifying any confusion consumers experience about the nature of the call and the service or product the sales agent purports to offer.

51.    Spark's sales agents routinely violated the TSA by failing to immediately state the purpose of their telemarketing calls. During telemarketing recordings that have been spliced and altered, Spark sales agent stated that they were calling about "provid[ing] you these better rates on your same electric bill," and about the "fixed rate on your electric bill," but failed to explicitly state that they were calling about switching the consumers' electricity or gas supplier and selling the consumer a different product entirely.

52.    Spark's sales agents routinely violated the TSA by failing to obtain consumers' consent before proceeding with the company's telemarketing solicitations.

53.    After reviewing hundreds of Spark's recorded telemarketing calls during the relevant time period, Plaintiff has not heard one Spark sales agent request consent from an Illinois consumer to proceed with the solicitation at the beginning of the call.

54.    Spark's sales agents consistently jumped right into their sales pitch, with no regard for whether the solicitation was consensual.

55.    For example:[3]

---

[2] These requirements apply to both outbound calls made from sales agents to consumers and to calls that a sales agent "cause[s] to be made . . . in a manner that does not comply with Section 15 [of the TSA]." *See* 815 ILCS 413/25.
[3] These representative recordings also appear altered and spliced.

FILED DATE: 1/16/2025 9:56 AM    2025CH00428

a.  In a November 2, 2019 solicitation, the Spark sales agent began the call with, "Hi my name is Chris Brown calling you on behalf of Spark Energy." The consumer responded, "yep" in an awkward tone. The sales agent continued, "This call is about to give you a current fixed rate on your electric bill. I do believe you are paying bills yourself and you are not getting any assistance to pay the bill, right?" The consumer responded, "yeah." The sales agent said, "Just to provide you these better rates on your same electric bill, can you grab a copy of your electric bill with a pen of piece of paper? I can hold the line." The consumer then looked for their bill. At no point during the call did the sales agent request consent from the consumer to proceed with the solicitation or state that he was calling about switching the consumers' electricity or gas supplier.

b.  During a solicitation on or around October 8, 2019, a sales agent from a third-party vendor, ROF, on behalf of Spark, began the call with, "Yes hello this is Francis [inaudible] calling on behalf of Spark Energy. How are you doing today?" The consumer says, "I am doing fine." The sales agent continued, "Just calling about [a] fixed rate on your electric bill. I believe you are paying your bill yourself?" The consumer said, "yes." The sales agent said, "This is to provide you with a fixed rate. Can you please grab a copy of your electric bill?" He then held the line while the consumer looked for her bill. At no point during the call did the sales agent request consent from the consumer to proceed with the solicitation or state that he was calling about switching the consumers' electricity or gas supplier.

FILED DATE: 1/16/2025 9:56 AM    2025CH00428

c.  During a May 1, 2019 telemarketing recording, a Spark sales agent began the call with, "Hello my name is [inaudible] with Spark Energy. Just to let you know this call is being recorded for your protection. May I speak with the person who handles the utility bill?" The consumer said "yes" in an awkward tone. The sales agent said, "Before we continue, are you currently getting any utility assistance such as LIHEAP or budget billing?" The consumer said, "no." The sales agent responded, "And are you currently 90 days past on your bill?" The consumer said, "no", to which the sales agent responded, "Ok you were not expecting my call, if you can go and grab a copy of the current bill and the pen and paper, I would like for you to write something down." At no point during the call did the sales agent request consent from the consumer to proceed with the solicitation or state that he was calling about switching the consumers' electricity or gas supplier.

d.  In an undated telemarketing recording, the Spark sales agent began the call with, "Hello my name is [inaudible] from Spark Energy. Just to let you know this call is being recorded for your protection. May I speak with the person who handles the utility bill?" The consumer said, "yeah" in an awkward tone. The sales agent responded, "Perfect. Before we continue, are you currently receiving any utility assistance such as LIHEAP, budget billing?", to which the consumer said, "No." The sales agent continued, "OK I got it. Are you currently 90 days or more past due on your utility bill?" The consumer said, "No." The sales agent said, "Great I know you were not expecting my call. If you could go and grab your current electric bill and a pen and paper, I would like you to write some

17

things down. I will hold while you get that." At no point during the call did the sales agent request consent from the consumer to proceed with the solicitation or state that he was calling about switching the consumers' electricity or gas supplier.

56.    Spark's failure to request consent from consumers is particularly glaring given that, around September 2019, one of Spark's vendors put Spark on further notice of this legal failure by telling Spark's then-Senior Director of Mass Market Sales, Jeff Rodgers, that the vendor's telemarketing sales script did not comply with the TSA consent requirement.

*Unfairly Raising Consumers' Rates Significantly and Without Notification*

57.    Around late 2018, and into 2019, Spark Energy acquired tens of thousands of customer accounts from other ARES. Shortly after acquiring these new customers, Spark Energy summarily increased their electric supply rates by more than 20% without notifying the customers beforehand, as required by law. Spark Energy's punishing rate increases resulted in Illinois consumers paying millions more in increased electricity costs between 2018 and 2022.

58.    Since 2018, Illinois regulations have required ARES to provide a written Rate Increase Notice to variable rate customers whenever their electricity rate jumps by more than 20% from one month to the next. 83 Ill. Admin. Code § 412.165(e) (Rate Notice to Customers). This regulation attempts to prevent ARES from surprising consumers with an unexpectedly high bill.

59.    Spark Energy customers have complained to the ICC about high electricity bills since at least 2019. Through its investigation of these complaints, ICC staff found that Spark Energy had increased many of these consumers' variable rates by more than 20% in a month—yet had failed to send Rate Increase Notices to consumers beforehand, startling many when they received high electricity bills.

FILED DATE: 1/16/2025 9:56 AM   2025CH00428

FILED DATE: 1/16/2025 9:56 AM    2025CH00428

60.    This confusion was compounded for consumers whose accounts had been transferred to Spark Energy from other ARES, including Starion, Verde, and Oasis. Many consumers did not receive notification that their accounts were being transferred from one ARES to another, let alone that the new ARES, Spark Energy, would be doubling their variable rates within months of the transfer.

61.    For example, Spark Energy increased many of these new customers' rates from 9.99 cents/kWh in January or February 2019 to a whopping 17.99 cents/kWh in March or April 2019.

62.    Spark Energy admitted to the ICC around March 2019 that it had failed to provide a Rate Increase Notice to a customer in violation of Section 412.165(c). Spark Energy admitted at least 30 more times to the ICC, in response to consumer complaints throughout 2020 and 2021, that it had violated Section 412.165(c) and failed to provide Rate Increase Notices to customers. For example:

    a.    One consumer, who had originally enrolled with another ARES, Verde, around 2012, was transferred to Spark Energy around 2018. Spark Energy increased this consumer's rate by more than 20% on September 11, 2018 and admitted to the ICC that it could not find the Rate Increase Notice.

    b.    Spark Energy admitted to the ICC that on August 31, 2020, it increased one consumer's rate by more than 20% in one month, from 11.99 cents/kWh to 16.99 cents/kWh, and that it could not locate a Rate Increase Notice.

    c.    Spark Energy admitted to the ICC that on April 11, 2019, it increased another consumer's rate by more than 20% and did not provide that consumer with a Rate Increase Notice.

19

FILED DATE: 1/16/2025 9:56 AM   2025CH00428

    d.   One consumer had initially enrolled with another ARES, Starion, around 2016 and was then transferred to Spark Energy. Spark Energy increased this consumer's rate by more than 20%, from 11.99 cents/kWh to 17.99 cents/kWh, on March 29, 2019 and admitted to the ICC that it did not send the consumer a Rate Increase Notice.

63.    To be clear, Spark Energy's violations of Section 412.165(c) extend beyond the few dozen ICC complaints. Spark Energy failed to provide Rate Increase Notices more than 24,000 times between May 1, 2018 and August 2022. Over 20,000 of these instances were for rate increases higher than 40%, with the highest increase being 135% in one month.

### *Misrepresenting that Consumers would Save Money*

64.    Spark's sales agents and written materials also violated 815 ILCS 505/2 by misrepresenting that Spark's rates were "low" and would save consumers money.

65.    The following misrepresentations are pulled directly from Spark's standard telemarketing scripts from 2013, 2014, and 2015:

- "I want to talk about how we can help save you money on your electricity bills";
- "Switching simply helps you save money on your electricity bill"; and
- "Did you know that when you select Spark as your supplier of electricity, you can lock into a low, fixed rate."

66.    Spark's 2015 written materials to consumers included language like, "Enjoy a fixed rate and more money in your pocket" and "enjoy another contract full of savings."

67.    In reality, Spark's electricity and gas rates have virtually never saved consumers money and have almost always resulted in consumers having less money in their pocket. From 2013 through 2022, Spark's predatory promises of lower costs and more savings resulted in Spark

FILED DATE: 1/16/2025 9:56 AM    2025CH00428

electricity and gas consumers paying *tens of millions* of dollars more than if they had stayed with their public utility for supply services.

68.     For example, during the first two years of the COVID-19 pandemic, from March 2020 through February 2022, Spark's electricity customers collectively paid over $32 million more than they would have if they had remained with their default public utility for electric supply; Spark's natural gas customers collectively paid over $7 million more during that same period.

### *Misrepresenting that Consumers would Receive Rebates, Refunds, and Gift Cards*

69.     Spark sales agents lied to consumers and promised to send consumers rebates, refunds, and $100 gift cards for enrolling with Spark supply services, when in fact no such rebates, refunds, or gift cards existed.

70.     From about May through November 2019 alone, over 35 consumers complained to the ICC that Spark Energy or Spark Gas had promised them rebates if they enrolled with Spark services, but they never received a rebate.

71.     Spark sales agents lied about rebates, refunds, and gift cards to lure consumers into switching to Spark's supply services in violation of 815 ILCS 505/2.

### *Misrepresenting an Affiliation with the Public Utility or Government*

72.     In an attempt to legitimize its predatory sales tactics, Spark Energy has also repeatedly misrepresented, either expressly or by implication, an association with ComEd, a public utility that consumers know and depend on to deliver their electricity, or a State-funded program. Stating or implicitly conveying an affiliation with ComEd or a governmental body violates the CFA. *See* 815 ILCS 505/2; 815 ILCS 505/2EE(b)(1)-(2) (prohibiting ARES from stating or implying that it represents, is endorsed by, or acting on behalf of a utility or governmental body).

FILED DATE: 1/16/2025 9:56 AM   2025CH00428

73.    While the deregulation of the utility market in 1997 allowed Illinois consumers to choose their electric or gas supplier, there is no state or ComEd "program."

74.    Spark Energy's scripts reference "ComEd's Electric Choice Program" and include language like, "ComEd now offers you a choice."

75.    Hundreds of Spark Energy telemarketing recordings during the relevant time period also reference an "Illinois Choice Program" or "Utility Choice Program."

76.    Hundreds of voicemails that Spark Energy sales representatives left for consumers between October 2018 and June 2022 include statements like, "I have noticed a change that is upcoming that will affect your ComEd supply benefits with us" and "[I'm] with Spark calling regarding the ComEd."

77.    Consumers also complained to the ICC that Spark Energy sales agents told them that they were from ComEd.

78.    Spark Energy deployed these deceitful terms during telemarketing calls to create an appearance of legitimacy with the utility and the State of Illinois to win over consumers.

*Unfairly and Deceptively Obtaining Consumers' Account Information*

79.    Since 2017, Illinois regulations have required ARES and AGS to obtain a consumer's consent for enrollment before requesting and recording the consumer's account information. 83 Ill. Admin. Code § 412.170(f) (Conduct, Training, and Compliance of ARES Sales Agents).

80.    Spark's sales agents routinely duped consumers into providing their sensitive account information, regardless of whether they actually wanted to enroll in Spark's services.

81.    During hundreds of telemarketing recordings during the relevant time period, Spark's sales agents instructed the consumer, after a few brief introductory remarks, to grab their

FILED DATE: 1/16/2025 9:56 AM    2025CH00428

current bill. Once the consumer returned with the bill, the sales agent then requested the consumer's account number without confirming whether the consumer agreed to enroll with Spark and before disclosing the material terms of the offer, such as the price per kWh or therm and length of the contract.

82.     For example: [4]

a.   In an undated telemarketing recording, Record Number 813114, 27 seconds into the call, the Spark sales agent told the consumer, "So now can you go and grab your light bill? I can hold on the line for you." After the consumer grabbed her bill, and about 57 seconds into the call, the sales agent continued, "Ma'am you can see on the right top corner the account number. Can you please read out the account number right top corner?" The sales agent recorded the consumer's account number before providing her with the material terms of the offer or requesting her consent to enroll in Spark's services.

b.    During a telemarketing solicitation on November 29, 2019, a sales agent from a third-party vendor, ROF, on behalf of Spark, stated about 30 seconds into the call, "I know you weren't expecting my call, if you can go and grab your electric bill, pen and paper, I would like you to write something down. I will hold while you get that." When the consumer returned with his bill, the sales agent requested that the consumer recite his account number on the bill, a little over a minute into the recording. The sales agent recorded the consumer's account number before providing her with the material terms of the offer or requesting her consent to enroll in Spark's services.

---

[4] These representative recordings also appear altered and spliced.

FILED DATE: 1/16/2025 9:56 AM    2025CH00428

c.  During an October 31, 2019 telemarketing solicitation, the sales agent instructed the consumer, about 90 seconds into the call, "Ok, please go and grab any copy of your ComEd electricity bill." After the consumer returned with her bill, the sales agent asked the consumer to recite the name on the utility bill, address, and the account number. The sales agent recorded the consumer's account number before providing her with the material terms of the offer or requesting her consent to enroll in Spark's services.

83.    Spark's practice of requesting consumers' account information, without first obtaining their consent for enrollment, is particularly troubling given Spark's pattern of "slamming" consumers by enrolling them in its services without their knowledge or consent, as detailed above.

### *Defrauding Senior Consumers*

84.    Spark Energy's telemarketing and door-to-door solicitations often defrauded senior consumers and consumers with disabilities. The CFA allows for civil penalties of $50,000 for each violation of the Act related to electric service fraud with respect to advertising, sale, soliciting, and billing a consumer over 60 years of age, 815 ILCS 505/2FF.

85.    It is evident from consumer complaints to the ICC and Spark Energy's telemarketing recordings that Spark Energy's predatory sales tactics frequently affected seniors. During the relevant time period, consumers repeatedly complained to the ICC about their elderly parents who were enrolled in Spark Energy's services and were forced to pay a higher utility bill, despite being unable to provide meaningful consent to enroll in Spark Energy's services.

86.    Spark Energy's conduct took advantage of senior consumers' desire to save money and pay less on their utility bills in violation of the CFA.

FILED DATE: 1/16/2025 9:56 AM    2025CH00428

## COUNT ONE

**Violations of Section 2EE of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/2EE**
**(against Spark Energy, LLC)**

87.    Plaintiff restates and realleges the foregoing paragraphs as if fully stated and alleged herein.

88.    Section 2EE of the Consumer Fraud Act, 815 ILCS 505/2EE, specifically addresses fraud by electricity service providers like Spark Energy, LLC.

89.    Spark Energy violated Section 2EE of the Consumer Fraud Act by (1) enrolling consumers without their knowledge or consent, and (2) altering telemarketing recordings.

90.    Pursuant to 815 ILCS 505/2EE(a)(iv), an ARES "shall not submit or execute a change in a consumer's selection of a provider of electric service unless and until . . . the [ARES] has obtained the consumer's express agreement to accept the offer after the disclosure of all material terms and conditions of the offer."

91.    As detailed above, Spark Energy repeatedly "slammed" consumers, enrolling them without their knowledge or consent.

92.    Pursuant to 815 ILCS 505/2EE(c), an ARES must record and retain telemarketing solicitations of consumer enrollments for 2 years. As part of its slamming scheme, Spark Energy altered or spliced hundreds of telemarketing recordings, as detailed above, that likely hid other deceptive sales tactics and in violation of its recording and retention obligations.

93.    Wherefore, Plaintiff prays that this honorable Court:

    a.    Find that Defendant Spark Energy's conduct violated Section 2EE of the Consumer Fraud Act;

    b.    Preliminarily and permanently enjoin Defendant Spark Energy from engaging in any unlawful practices under Section 2EE of the Consumer Fraud Act as alleged herein, including but not limited to a permanent injunction barring Defendant

FILED DATE: 1/16/2025 9:56 AM    2025CH00428

Spark Energy from engaging in the sale of electric supply in or from the State of Illinois;

c.  Revoke all licenses, charters, franchises, certificates, or other evidence of authority of Defendant Spark Energy to do business in the State of Illinois, including Defendant Spark Energy's Certificate of Service Authority to operate as an alternative retail electric supplier in the State of Illinois;

d.  Award such relief as the Court finds necessary to redress injury to consumers resulting from Defendant Spark Energy's violations of the Consumer Fraud Act, including but not limited to, restitution, rescission of contracts entered into between Defendant Spark Energy and Illinois consumers, the refund of monies paid, and the disgorgement of ill-gotten monies;

e.  Order Defendant Spark Energy to pay a civil penalty of $50,000 per unfair or deceptive act or practice, and an additional amount of $50,000 for each act or practice found to have been committed with intent to defraud, as provided by Section 7(b) of the Consumer Fraud Act;

f.  Order Defendant Spark Energy to pay a civil penalty of $50,000 for each violation against an elderly consumer, defined as a person 60 years of age or older as provided in Section 2FF of the Consumer Fraud Act;

g.  Order Defendant Spark Energy to pay a civil penalty of $50,000 for each violation against a person with a disability as provided in Section 2FF of the Consumer Fraud Act, 815 ILCS 505/2FF(2);

h.  Order Defendant Spark Energy to pay all costs for the prosecution and investigation of this action, as provided by Section 10 of the Consumer Fraud Act; and

i.  Provide such other and further equitable relief as justice and equity may require.

## COUNT TWO

**Violations of Section 2DDD of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/2DDD
(against Spark Energy Gas, LLC)**

94. Plaintiff restates and realleges the foregoing paragraphs as if fully stated and alleged herein.

FILED DATE: 1/16/2025 9:56 AM    2025CH00428

95.     Section 2DDD of the Consumer Fraud Act, 815 ILCS 505/2DDD, specifically addresses fraud by gas service providers like Spark Energy Gas, LLC.

96.     Spark Gas violated Section 2DDD of the Consumer Fraud Act by (1) enrolling consumers without their knowledge or consent, and (2) altering telemarketing recordings.

97.     Pursuant to 815 ILCS 505/2DDD(d), an AGS "shall not submit or execute a change in a consumer's selection of a provider of natural gas unless and until…the [AGS] has obtained the consumer's express agreement to accept the offer after the disclosure of all material terms and conditions of the offer."

98.     As detailed above, Spark Gas repeatedly "slammed" consumers, enrolling them without their knowledge or consent.

99.     As part of its slamming scheme, Spark Gas appears to have altered or spliced hundreds of telemarketing recordings to hide other deceptive sales tactics and enroll consumers in Spark Gas's services without their consent.

100.    Wherefore, Plaintiff prays that this honorable Court:

a.  Find that Defendant Spark Gas's conduct violated Section 2DDD of the Consumer Fraud Act;

b.  Preliminarily and permanently enjoin Defendant Spark Gas from engaging in any unlawful practices under Section 2DDD of the Consumer Fraud Act as alleged herein, including but not limited to a permanent injunction barring Defendant Spark Gas from engaging in the sale of gas supply in or from the State of Illinois;

c.  Revoke all licenses, charters, franchises, certificates, or other evidence of authority of Defendant Spark Gas to do business in the State of Illinois, including Defendant Spark Gas's Certificate of Service Authority to operate as an alternative gas supplier in the State of Illinois;

d.  Award such relief as the Court finds necessary to redress injury to consumers resulting from Defendant Spark Gas's violations of the Consumer Fraud Act, including but not limited to, restitution, rescission of contracts entered into

between Defendant Spark Gas and Illinois consumers, the refund of monies paid, and the disgorgement of ill-gotten monies;

e.  Order Defendant Spark Gas to pay a civil penalty of $50,000 per unfair or deceptive act or practice, and an additional amount of $50,000 for each act or practice found to have been committed with intent to defraud, as provided by Section 7(b) of the Consumer Fraud Act;

f.  Order Defendant Spark Gas to pay all costs for the prosecution and investigation of this action, as provided by Section 10 of the Consumer Fraud Act; and

g.  Provide such other and further equitable relief as justice and equity may require.

## **COUNT THREE**

**Violations of Section 2 of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/2**
**(against both Defendants)**

101.  Plaintiff restates and realleges the foregoing paragraphs as if fully stated and alleged herein.

102.  While engaged in trade or commerce, Spark committed unfair or deceptive acts or practices declared unlawful by Section 2 of the Consumer Fraud Act, with the intent that consumers rely on them, by engaging in the following acts or practices:

a.  Misrepresenting low costs and savings for its product, when, in reality, consumers who switched to Spark virtually always paid more than they would have if they had remained with the public utility;

b.  Misrepresenting that consumers would receive rebates, refunds, or gift cards if they enrolled in Spark's services;

c.  Misrepresenting an affiliation with the public utility or governmental body;

d.  Deceptively and unfairly obtaining consumers' account information without consent to enroll in Spark's services and prior to disclosing the material terms

28

FILED DATE: 1/16/2025 9:56 AM   2025CH00428

of the offer, which conduct is immoral, oppressive, unethical, a violation of public policy, and which caused substantial injury to consumers; and

e. Spark Energy unfairly engaging in conduct that is immoral, oppressive, unethical, is a violation of public policy, and caused substantial injury to consumers, by repeatedly failing to notify variable rate consumers of large monthly rate increases of more than 20%.

103.   Wherefore, Plaintiff prays that this honorable Court:

a. Find that Defendants committed unfair or deceptive acts or practices in the conduct of trade or commerce in violation of Section 2 of the Consumer Fraud Act;

b. Preliminarily and permanently enjoin Defendants from engaging in any unlawful practices under Section 2 of the Consumer Fraud Act as alleged herein, including but not limited to a permanent injunction barring Defendants from engaging in the sale of electric and gas supply in or from the State of Illinois;

c. Revoke all licenses, charters, franchises, certificates, or other evidence of authority of Defendants to do business in the State of Illinois, including Defendants' Certificate of Service Authority to operate as an alternative retail electric and gas supplier in the State of Illinois;

d. Award such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the Consumer Fraud Act, including but not limited to, restitution, rescission of contracts entered into between Defendants and Illinois consumers, the refund of monies paid, and the disgorgement of ill-gotten monies;

e. Order Defendants to pay a civil penalty of $50,000 per unfair or deceptive act or practice, and an additional amount of $50,000 for each act or practice found to have been committed with intent to defraud, as provided by Section 7(b) of the Consumer Fraud Act;

f. Order Defendants to pay a civil penalty of $50,000 for each violation against an elderly consumer, defined as a person 60 years of age or older as provided in Section 2FF of the Consumer Fraud Act;

FILED DATE: 1/16/2025 9:56 AM   2025CH00428

g. Order Defendants to pay a civil penalty of $50,000 for each violation against a person with a disability as provided in Section 2FF of the Consumer Fraud Act, 815 ILCS 505/2FF(2);

h. Order Defendants to pay all costs for the prosecution and investigation of this action, as provided by Section 10 of the Consumer Fraud Act; and

i. Provide such other and further equitable relief as justice and equity may require.

## **COUNT FOUR**

### Violations of the Telephone Solicitations Act, 815 ILCS 413/1 *et seq.* (against both Defendants)

104. Plaintiff restates and realleges the foregoing paragraphs as if fully stated and alleged herein.

105. The Telephone Solicitations Act provides that, "[v]iolation of any of the provisions of this Act is an unlawful practice under Section 2Z of the Consumer Fraud and Deceptive Business Practices Act. All remedies, penalties, and authority granted to the Attorney General by that Act shall be available to him for the enforcement of this Act." 815 ILCS 413/25.

106. Section 15 of the Telephone Solicitations Act requires telemarketers to (1) "immediately state . . . the purpose of the call", and (2) "inquire at the beginning of the call whether the person called consents to the solicitation". 815 ILCS 413/15(b)(1)-(2).

107. A knowing violation of the Telephone Solicitations Act is an unlawful practice under Section 2Z of the Consumer Fraud Act, 815 ILCS 413/25(e) and 815 ILCS 505/2Z.

108. Defendants have initiated, or directed its agents to initiate, "telephone solicitation[s]," as defined in the Telephone Solicitations Act, 815 ILCS 413/5, to Illinois consumers.

109. As detailed above, Spark knowingly solicited consumers without inquiring at the beginning of the phone call whether the consumer consented to the solicitation and without stating

FILED DATE: 1/16/2025 9:56 AM     2025CH00428

that they were calling about switching the consumers' electricity or gas supplier and selling the consumer a different product entirely.

110.     Spark's practices described herein constitute violations of Section 15 of the Telephone Solicitations Act, 815 ILCS 413/15, as well as Section 2Z of the Consumer Fraud Act, 815 ILCS 505/2Z.

111.     Wherefore, Plaintiff prays that this Honorable Court:

    a.  Find that Defendants' conduct violated the Telephone Solicitations Act and Section 2Z of the Consumer Fraud Act;

    b.  Preliminarily and permanently enjoin Defendants from engaging in any unlawful practices under Section 2Z of the Consumer Fraud Act and the Telephone Solicitations Act as alleged herein, including but not limited to a permanent injunction barring Defendants from engaging in the sale of electric and gas supply in or from the State of Illinois;

    c.  Revoke all licenses, charters, franchises, certificates, or other evidence of authority of Defendants to do business in the State of Illinois, including Defendants' Certificate of Service Authority to operate as an alternative retail electric and gas supplier in the State of Illinois;

    d.  Award such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the Telephone Solicitations Act and Consumer Fraud Act, including but not limited to, restitution, rescission of contracts entered into between the Defendants and Illinois consumers, the refund of monies paid, and the disgorgement of ill-gotten monies;

    e.  Order Defendants to pay a civil penalty of $50,000 per unfair or deceptive act or practice, and an additional amount of $50,000 for each act or practice found to have been committed with intent to defraud, as provided by Section 7(b) of the Consumer Fraud Act;

    f.  Order Defendants to pay a civil penalty of $50,000 for each violation against an elderly consumer, defined as a person 60 years of age or older as provided in Section 2FF of the Consumer Fraud Act;

    g.  Order Defendants to pay a civil penalty of $50,000 for each violation against a person with a disability as provided in Section 2FF of the Consumer Fraud Act, 815 ILCS 505/2FF(2);

FILED DATE: 1/16/2025 9:56 AM    2025CH00428

h.  Order Defendants to pay all costs for the prosecution and investigation of this action, as provided by Section 10 of the Consumer Fraud Act; and

i.  Provide such other and further equitable relief as justice and equity may require.

Respectfully submitted,

THE PEOPLE OF THE STATE OF ILLINOIS, BY KWAME RAOUL, Attorney General of the State of Illinois

Dated: January 16, 2025

By: *Susan N. Ellis*
    Susan N. Ellis
    One of the Attorneys for Plaintiff

By: */s/ Christopher J. Wilmes*
    Christopher J. Wilmes
    One of the Attorneys for Plaintiff

Susan N. Ellis
Chief, Consumer Protection Division
Thomas J. Verticchio
Assistant Chief Deputy Attorney General
Darren Kinkead
Counsel, Public Interest Division
115 South LaSalle Street
Chicago, IL 60603
(312) 814-3000
Susan.Ellis@ilag.gov
Thomas.Verticchio@ilag.gov
Darren.Kinkead@ilag.gov
Atty. No: 99000

Christopher J. Wilmes
Tory Tilton
Special Assistant Attorneys General
Hughes Socol Piers Resnick & Dym, Ltd.
70 W. Madison St., Ste. 4000
Chicago, IL 60602
(312) 580-0100
cwilmes@hsplegal.com
ttilton@hsplegal.com
Atty. No. 45667

Benjamin Blustein
Robert S. Libman
Matthew Owens
Paul S. Balik
Bernardo Lopez
Special Assistant Attorneys General
Miner, Barnhill & Galland, P.C.
325 N. LaSalle St., Ste. 350
Chicago, IL 60654
(312) 751-1170
bblustein@lawmbg.com
rlibman@lawmbg.com
mowens@lawmbg.com
pbalik@lawmbg.com

Jay Edelson
Ari Scharg
Jimmy Rock
Shantel Chapple Knowlton
Michael Ovca
Special Assistant Attorneys General
Edelson PC
350 N. LaSalle St., 14th Fl.
Chicago, IL 60654
(312) 589-6370
jedelson@edelson.com
ascharg@edelson.com
jrock@edelson.com
schappleknowlton@edelson.com

FILED DATE: 1/16/2025 9:56 AM    2025CH00428

blopez@lawmbg.com
Atty. No. 44720

movca@edelson.com
Atty. No. 62075